UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, AND ALLSTATE NORTH AMERICAN INSURANCE COMPANY, | C.A. No. |
| Plaintiffs, | |
| v. | |
| MIDWEST PAIN SPECIALISTS S.C., ADVANCED CARE RX LLC, ADVANCE SPECIALISTS HOLDINGS S.C., ANSU DURGUT, D.C., ALEX KARBAN, D.C., JLV1, S.C. d/b/a ADVANCE SPINE & REHAB CENTER, METRO NORTH SURGICAL S.C., PROMEDIX, P.C., ARASH RAEI, PHARMD, FAISAL SAHAWNEH, PHARMD, AND JAMIE VANDENELZEN, D.C., | **Demand for Jury Trial** |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate North American Insurance Company (hereinafter collectively referred to as "Allstate" and/or "Plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink P.C., hereby allege as follows:

## I.    **INTRODUCTION**

1.      Jamie Vandenelzen, D.C. ("Dr. Vandenelzen"), and his coconspirators, Ansu Durgut, D.C. ("Dr. Durgut"), Arash Raei, PharmD ("Raei, PharmD"),  Faisal Sahawneh, PharmD ("Sahawneh, PharmD"), and Alex Karban, D.C. ("Dr. Karban"), by and through the their respective businesses, Advanced Care Rx LLC ("Advanced Care"), Advance Specialists Holdings S.C. ("Advance Holdings"), JLV1, S.C. d/b/a Advance Spine & Rehab Center ("ASR"), Metro North Surgical S.C.[1] ("Metro"), Midwest Pain Specialists S.C. ("Midwest"), and Promedix, P.C. ("Promedix") (hereinafter referred to collectively as the "Defendants"), engaged in a scheme to defraud Allstate by submitting[2] fraudulent records, and bills ("False Medical Documentation"), for the rendering of medical services and surgical procedures, and the sale of durable medical equipment ("DME") and prescription medication, through the U.S. Mail seeking ultimately to collect payment from Allstate.

2.      The scheme, illustrated below, was intentionally initiated, promoted, financed, operated and/or maintained by the Defendants.

3.      The Defendants are aware that their scheme is unfair and deceptive to payors of healthcare goods and services, such as Allstate.

4.      The Defendants' scheme involved intentional fraudulent conduct, including:

   a.   Participation in an improper fee-splitting and unlawful patient referral agreement;

---

[1] Metro North Surgical S.C. is formerly known as Metro North Surgical Corp. as well as Metro North Surgical Center S.C. (hereinafter collectively referred to as "Metro").

[2] The Defendants submitted or caused to be submitted to Allstate false medical documentation through the U.S. Mail. The phrase "submitted or caused to be submitted" will be shortened to "submitted" throughout.

b. Illegally operating and hosting medical procedures at Metro, an unlicensed ambulatory surgical treatment center;

c. Billing for fraudulent, unlawful, and grossly excessive surgical facility services and fees;

d. Illegally operating Midwest, an unlicensed HME/DME distributor;

e. Billing for the unlawful dispensing of medically unnecessary DME products (by Midwest) and prescription medication (by Advanced Care and Promedix);

f. Billing for medically unnecessary and grossly excessive fees for DME and prescription medication, and related services; and

g. Billing for therapy services reportedly performed at ASR that were not rendered as represented, nor medically necessary.

5.      The Defendants targeted the insurance benefits available to motor vehicle accident victims (also referred to herein as "Allstate claimants") to ensure a steady stream of revenue to support their fraudulent scheme.

6.      The Defendants abused the Allstate claimants' insurance coverage by billing for healthcare services[3] that the Defendants had no legal right to collect.

7.      The Defendants intended to siphon payments from the proceeds of the insurance monies paid by Allstate to resolve the claimants' medical expenses and bodily-injury claims.

8.      The Defendants' conduct constitutes an intentional violation of Illinois laws and regulations governing licensure and medical decision-making.

9.      The Defendants mailed False Medical Documentation directly to Allstate.

---

[3] The term "healthcare services" shall mean medical, chiropractic, and surgical procedures, and the sale of durable medical equipment ("DME") and prescription medication, and related services.

10.     The Defendants mailed False Medical Documentation to Allstate claimants and/or their personal injury attorneys who, in turn, mailed the documents to Allstate in support of the Allstate claimants' medical expense and bodily-injury claims.

11.     Allstate justifiably and detrimentally relied upon the Defendants' False Medical Documentation in evaluating insurance claims.

12.     The Defendants knew that Allstate would rely on the representations made in the Defendants' records and bills when determining whether to pay medical expenses and bodily-injury claims.

13.     The Defendants secured payment for their services by asserting healthcare liens under 770 ILCS 23/10, which purportedly gave the Defendants the right to be paid from settlements, judgments, or awards obtained by the Allstate claimants.

14.     Allstate made payments to the Defendants, and Allstate was also caused to make payments in connection with bodily-injury claims presented by the Allstate claimants, which collectively total more than $1,143,195.62 (the exact amount to be determined at trial).

15.     Allstate made payments on these claims in direct reliance on the False Medical Documentation created by the Defendants.

16.     In all cases, Allstate reasonably relied upon the Defendants' misrepresentations and omissions of material fact concerning (1) unlicensed ambulatory surgery center fees; (2) unlicensed DME fees; (3) treatment not rendered; (4) unlawful referrals and prescriptions; (5) unnecessary healthcare services provided pursuant to a pre-determined treatment protocol; and (6) at grossly excessive charges.

17.     By its pleading, Allstate brings this action against the Defendants seeking damages for violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962, and under Illinois state laws, including (a) violations of 720 ILCS 5/17-10.5 (Insurance Claims Fraud Provention Act), (b) common law fraud, and (c) unjust enrichment.

18.     Allstate also seeks an order declaring that Allstate has no obligation to pay the Defendant Medical Companies for any of the fees at issue in this Complaint. [4]

19.     Allstate also seeks an award of (a) double damages, treble damages, and punitive damages as authorized by law, (b) statutory interest, (c) costs, and (d) attorneys' fees.

## II.    THE PARTIES

### A.    PLAINTIFFS

20.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate North American Insurance Company are corporations duly organized and existing under the laws of the State of Illinois.

21.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate North American Insurance Company have their respective principal places of business in Northbrook, Illinois.

22.     At all times relevant to the allegations contained in this Complaint, the Plaintiffs were authorized to conduct business in the State of Illinois.

---

[4] The term "Defendant Medical Companies" shall refer to Advanced Care, Advance Holdings, ASR, Metro, Midwest, and Promedix.

B.     **DEFENDANTS**

1.     **Jamie Vandenelzen, D.C.**

23.    Dr. Vandenelzen is a resident and citizen of the State of Illinois.

24.    Dr. Vandenelzen is a licensed Illinois chiropractor.

25.    Chiropractors are regulated under the Illinois Medical Practice Act of 1987
("MPA"), which defines the scope of a 'Chiropractic physician' as a person licensed to treat human
ailments without the use of drugs (prescription medication or otherwise) or surgery. 225 ILCS
60/2.

26.    As is set forth in detail below, Dr. Vandenelzen has violated the MPA by practicing
beyond the scope of chiropractic medicine.

27.    Dr. Vandenelzen exclusively owns and controls 10725 S. Western, LLC ("Western
LLC"), a real estate company that was incorporated in Illinois in 2016.

28.    Western, LLC owns 11418-11422 S. Western Avenue, Chicago, Il 60643
("Western Avenue) and 2649-2651 N. Laramie Avenue, Chicago, IL 60639 ("Laramie Avenue").

29.    Western LLC's principal place of business is at the Laramie Avenue address.

30.    Dr. Vandenelzen also co-owned and controlled Advanced Care, a pharmacy, with
Raei, PharmD from its incorporation until it disbanded in or around 2023.

31.    Dr. Vandenelzen co-owns and controls Advance Holdings, which is the alter ego
of ASR, with his partner, Dr. Durgut.

32.    Dr. Vandenelzen owns and controls ASR, a chiropractic clinic, with his partner, Dr
Durgut.

-6-

33. Dr. Vandenelzen owns and controls Metro, an unlicensed ambulatory surgical center.

34. Dr. Vandenelzen owns and controls Midwest, an unlicensed DME supplier.

35. Dr. Vandenelzen also owns Promedix, a pharmacy, which is the successor of Advanced Care.

36. Due to his ownership and control over Advanced Care, Advance Holdings, ASR, Metro, Midwest, and Promedix, Dr. Vandenelzen is responsible for the unlawful, medically unnecessary, and unreasonably charged services billed for by Advanced Care, Advance Holdings, ASR, Metro, Midwest, and Promedix in connection with Allstate claimants.

### 2. **Advanced Care Rx LLC**

37. Advanced Care is a pharmacy that was incorporated in Illinois in 2017.

38. Advanced Care's principal place of business is at the Western Avenue address.

39. Raei, PharmD and Dr. Vandenelzen are listed as Advanced Care's only Managers.

40. Advanced Care dispensed prescription medication to Allstate claimants that treated at ASR and Metro.

41. Until February of 2023, Raei, PharmD was the Pharmacist-in-Charge at Advanced Care.

42. Since February of 2023, Sahawneh, PharmD, was the Pharmacist-in-Charge for Advanced Care.

43. The responsibilities of the Pharmacist-in-Charge shall include the "[s]upervision of all activities of all employees as they relate to the practice of pharmacy…" Ill. Admin. Code tit. 68 § 1330.660(d)(1).

44. Advanced Care was succeeded by Promedix.

45. As set out below, and based on information provided by Allstate claimants and documentation submitted to Allstate by the Defendants, Advanced Care and Promedix billed unlawfully for medication that was not provided as represented and/or provided at all, and for unnecessary medication.

46. Due to their ownership and control over Advanced Care, Raei, PharmD, Sahawneh, PharmD, and Dr. Vandenelzen, are responsible for the unlawful, medically unnecessary, and unreasonably charged distribution of medication and services billed by Advanced Care in connection with Allstate claimants.

3. **Advance Specialists Holdings S.C.**

47. Based upon the documentation submitted to Allstate by the Defendants, Advance Holdings is a business used by ASR and Dr. Vandenelzen to collect payment for services purportedly rendered at ASR.

48. Advance Holdings is a corporation organized under the laws of the State of Illinois in 2020.

49. Advance Holdings is owned and operated by Dr. Vandenelzen and Dr. Durgut.

50. Advance Holdings' principal place of business is at the Laramie Avenue address.

51. Dr. Vandenelzen is the President and a Director of Advance Holdings.

52. Dr. Durgut is the Secretary and a Director of Advance Holdings.

53. Due to their ownership and control over Advance Holdings, Dr. Durgut and Dr. Vandenelzen are responsible for the unlawful, medically unnecessary, and unreasonably charged

medical services billed for by Advance Holdings in connection with healthcare services purportedly rendered to Allstate claimants at ASR.

### 4. JLV1, S.C. d/b/a Advance Spine & Rehab Center

54.     ASR is a chiropractic clinic that was incorporated in Illinois in 2013. It was converted from an LLC to a corporation in 2020.

55.     ASR has a location at the Western Avenue Address and a location at the Laramie Avenue address.

56.     ASR's principal place of business is at the Western Avenue address.

57.     ASR is owned and operated by Dr. Vandenelzen.

58.     Dr. Vandenelzen is the President and Director of ASR.

59.     Dr. Durgut treated patients at ASR.

60.     Dr. Karban treated patients at ASR.

61.     As set out below, based on information provided by Allstate claimants, ASR chiropractors (a) billed pursuant to an unlawful referral agreement, (b) billed for services that were not provided as represented, (c) billed for services that were not provided at all, and (d) prescribed medication and injections to Allstate claimants under the guise that the prescriptions were written by licensed medical doctors.

62.     Due to their control over ASR, Dr. Vandenelzen, Dr. Karban, and Dr. Durgut are responsible for the unlawful, medically unnecessary, and unreasonably charged fees billed to Allstate by ASR in connection with Allstate claimants.

### 5. Metro North Surgical S.C.

63.     Metro is a corporation organized under the laws of the State of Illinois in 2019 as Metro North Surgical Center S.C.

64.     In or about July 2022, Metro changed its business name to Metro North Surgical Corp.

65.     In or about December 2022, Metro changed its business name to Metro North Surgical S.C.

66.     Metro's principal place of business is at the Laramie Avenue address.

67.     Metro occupies the space directly adjacent to a branch of ASR.

68.     Metro is owned and operated by Dr. Vandenelzen.

69.     Dr. Vandenelzen is the President and the Director of Metro.

70.     In Illinois, ambulatory surgical treatment centers must be licensed.

71.     In Illinois, ambulatory surgical treatment centers must have a medical director.

72.     According to  Dr. Vandenelzen, Metro had a medical director since it opened.

73.     According to Dr. Vandenelzen, Medical Doctor 1 was the medical director of Metro from 2021 until 2023.

74.     According to Dr. Vandenelzen, Medical Doctor 2 has been the medical director of Metro since 2023.

75.     At least since 2024, Metro has been operating without a medical director.

76.     Metro illegally hosts surgical procedures purportedly performed on Allstate claimants.

77.     As set out below, Metro (a) billed for services that were purportedly provided in violation of Illinois law, (b) billed pursuant to an unlawful referral agreement, and (c) billed for surgical facility services that were unlawful, and grossly excessive.

78.     Due to his control over Metro, Dr. Vandenelzen, is responsible for the unlawful, medically unnecessary, and unreasonably charged fees billed for by Metro in connection with Allstate claimants.

### 6.     **Midwest Pain Specialists S.C.**

79.     Midwest is a corporation organized under the laws of the State of Illinois in 2015.

80.     Midwest purports to be a DME distributor.

81.     Midwest is not licensed or authorized by the Illinois Department of Financial & Professional Regulation to dispense DME in Illinois.

82.     Midwest illegally dispenses DME to Allstate claimants in Illinois.

83.     Midwest's principal place of business is at the Western Avenue address.

84.     Midwest is owned and operated by Dr. Vandenelzen.

85.     Dr. Vandenelzen is the President of Midwest.

86.     As set out below, Midwest (a) billed for DME services that were provided in violation of Illinois law, (b) billed pursuant to an unlawful referral agreement, and (c) billed for DME that was not provided as represented, nor medically necessary in connection with Allstate claimants.

87.     Due to his purported control over Midwest, Dr. Vandenelzen  is responsible for the unlawful, medically unnecessary, and unreasonably charged fees billed by Midwest in connection with Allstate claimants.

### 7. Promedix, P.C.

88. Promedix is a pharmacy that was incorporated in Illinois in 2023. It is the successor of Advanced Care.

89. Promedix's principal place of business is at the Western Avenue address.

90. Dr. Vandenelzen owns and operates Promedix.

91. Sahawneh, PharmD was the Pharmacist-In-Charge of Promedix from March of 2023 until 2024.

92. As set out below, based upon the documentation submitted to Allstate by the Defendants and on information provided by the Allstate claimants, Promedix (a) billed pursuant to an unlawful referral agreement in violation of Illinois law, (b) billed for medication that was not provided as represented and/or provided at all, and (c) billed for unnecessary medications at grossly excessive charges.

93. Due to their control over Promedix, Sahawneh, PharmD and Dr. Vandenelzen, are responsible for the unlawful, medically unnecessary, and unreasonably charged distribution of medication and services billed for by Advanced Care in connection with Allstate claimants.

### 8. Ansu Durgut, D.C.

94. Dr. Durgut is a resident and citizen of the State of Illinois.

95. Dr. Durgut is a licensed chiropractor in Illinois.

96. Dr. Durgut treats patients at ASR.

97. At all times relevant, Dr. Durgut co-owned and co-controlled Advance Holdings, the alter ego of ASR, with Dr. Vandenelzen.

98.     Due to Dr. Durgut's purported control over ASR and Advance Holdings, Dr. Durgut is responsible for the unlawful, medically unnecessary, and unreasonably charged fees billed by ASR in connection with Allstate claimants.

### 9.     Alex Karban, D.C.

99.     Dr. Karban is a resident and citizen of the State of Illinois

100.    Dr. Karban is a chiropractor licensed in Illinois.

101.    From at least 2020, Dr. Karban worked for Dr. Vandenelzen at ASR.

102.    Due to his participation in the scheme set out below, he is responsible for the unlawful, medically unnecessary, and unreasonably charged services billed by ASR in connection with Allstate claimants.

### 10.     Arash Raei, PharmD

103.    Raei, PharmD is a resident and citizen of the State of Illinois.

104.    Raei, PharmD is a pharmacist licensed in Illinois.

105.    Until February of 2023, Raei, PharmD was the Pharmacist-in-Charge at Advanced Care.

106.    Due to his ownership and control over Advanced Care, Raei, PharmD, is responsible for the unlawful, medically unnecessary, and unreasonably charged distribution of medication and services billed by Advanced Care in connection with Allstate claimants.

### 11.     Faisal Sahawneh, PharmD

107.    Sahawneh, PharmD is a resident and citizen of the State of Illinois.

108.    Sahawneh, PharmD is a licensed pharmacist in Illinois.

109.    Since February of 2023, Sahawneh, PharmD, was the Pharmacist-in-Charge for Advanced Care.

110.    Sahawneh, PharmD was the Pharmacist-in-Charge for Promedix.

111.    Due to his ownership and control over Advanced Care and Promedix, Sahawneh, PharmD is responsible for the unlawful, medically unnecessary, and unreasonably charged distribution of medication and services billed by Advanced Care and Promedix in connection with Allstate claimants.

## III.    JURISDICTION AND VENUE

112.    Jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331.

113.    Supplemental jurisdiction over the Plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1967.

114.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the majority of the acts at issue in this Complaint were carried out within the Northern District of Illinois.

## IV.    APPLICABLE LAW

### A.    ILLINOIS AMBULATORY SURGICAL TREATMENT CENTER ACT

115.    The Ambulatory Surgical Treatment Center Act (the "ASTCA"), also known as 210 ILCS 5 *et seq*., governs the licensure and operation of ambulatory surgical treatment centers in Illinois.

116.    Under the ASTCA, an ambulatory surgical treatment center is "any institution, place or building devoted primarily to the maintenance and operation of facilities for the performance of surgical procedures."  210 ILCS 5/3(A).

117.    The ASTCA also incorporates the Illinois Administrative Code's definition of ambulatory surgical treatment center.  *Id.*

118.    Under the Illinois Administrative Code, ambulatory surgical treatment center means:

> Any institution or building devoted primarily to the maintenance and operation of facilities for the performance of surgical procedures, and any place that meets and complies with the definition of an ambulatory surgical treatment center under the [ASTCA] and this Part, as evidenced by use of the facilities by physicians, podiatrists or dentists in the performance of surgical procedures that constitutes more than 50 percent of the activities at that location.

Ill. Admin. Code tit. 77, § 205.110 (2019).

119.    Section 5/4 of the ASTCA states that "[n]o person shall open, conduct or maintain an ambulatory surgical treatment center without first obtaining a license from the [Illinois Department of Public Health]." 210 ILCS 5/4.[5]

120.    Indeed, the ASTCA "contains a detailed set of requirements which must be met before the Director of Public Health may issue a license." *Arient v. Yasser Alhaj-Hussein*, 91 N.E.3d 513, 524 (Ill. App. Ct. 2017).

121.    Specifically, a license shall only issue if the applicant facility complies with all rules, regulations, and standards set forth in the ASTCA, and: (i) is under the medical supervision of one (1) or more physicians; (ii) permits a surgical procedure to be performed only by a physician, podiatric physician, or dentist who at the time is privileged to have his patients admitted

---

[5] The ASTCA defines "person" as "any individual, firm, partnership, corporation, company, association, or joint stock association, or the legal successor thereof."  210 ILCS 5/3.

by himself or an associated physician and is himself privileged to perform surgical procedures in at least one (1) Illinois hospital; and (iii) maintains adequate medical records for each patient.

122.    Further, "[a]ny person opening, conducting or maintaining an ambulatory surgical treatment center without a license issued pursuant to [the ASTCA] shall be guilty of a business offense punishable by a fine of $10,000.00 and each day's violation shall constitute a separate offense." *Id.* at 5/12.

123.    Metro is not licensed or authorized by the Illinois Department of Public Health to operate as an ambulatory surgical treatment center.

**B.    ILLINOIS HOME MEDICAL EQUIPMENT AND SERVICES PROVIDER LICENSE ACT**

124.    Under the Illinois Home Medical Equipment and Services Provider License Act, also known as 225 ILCS 51/10 ("HME License Act"), to distribute DME to customers, Home Medical Equipment (HME) distributors must be licensed by the Department of Financial & Professional Regulation (IDFPR).

125.    No entity shall provide or hold itself out as providing home medical equipment and services, or use the title "home medical equipment and services provider" in connection with his or her profession or business, without a license issued by the IDFPR. 225 ILCS 51/15(a).

126.    Midwest is not, nor has it ever been licensed with the IDFPR.

**C.    ILLINOIS MEDICAL PRACTICE ACT**

127.    The Medical Practice Act, also known as 225 ILCS 60/22.2, prohibits physicians and chiropractors from dividing, sharing, or splitting any professional fee or other form of

compensation for professional services with anyone in exchange for a referral or otherwise, other than as provided in Section 22.2 of the Practice Act.

128.    That means that physicians and chiropractic physicians may not divide or pay a referral fee to anyone, including another health care provider.

129.    Prohibited payments may be direct or indirect payments, including veiled value such as providing office space or services to referring providers for less than fair market value.

### D.    HEALTH CARE WORKER SELF-REFERRAL ACT

130.    The Heath Care Worker Self-Referral Act ("Self-Referral Act"), also known as 225 ILCS 47, in part, prohibits patient referrals to entities providing health services in which the referring health care worker has an investment interest.

131.    Pursuant to the Self-referral Act, a "Health Care Worker" means any individual licensed under the laws of Illinois to provide health services, including but not limited to: pharmacists licensed under the Pharmacy Practice Act (225 ILCS 85) and physicians and chiropractors licensed under the Medical Practice Act (225 ILCS 60).

132.    "Investment Interest" means an equity or debt security issued by an entity, including, without limitation, shares of stock in a corporation, units or other interests in a partnership, bonds, debentures, notes, or other equity interests or debt instruments except that investment interest does not include interest in a hospital licensed under the laws of the State of Illinois.  *See* 225 ILCS 47/15(g).

133.    "Investor" means an individual or entity directly or indirectly owning a legal or beneficial ownership or investment interest (such as through an immediate family member, trust, or another entity related to the investor). *See* 225 ILCS 47/15(h).

134.    A "referral" means any referral of a patient for health services, including, without limitation:

> The forwarding of a patient by one health care worker to another health care worker or to an entity outside the health care worker's office practice or group practice that provides health services.

*See* 225 ILCS 47/15(j).

135.    A health care worker or other entity shall not enter into an arrangement or scheme seeking to make referrals to another health care worker or entity based upon the condition that the health care worker or entity will make referrals with an intent to evade the prohibitions of the Self-Referral Act by inducing patient referrals which would be prohibited by this Section if the health care worker or entity made the referral directly. *See* 225 ILCS 47/20(e).

**E.    ILLINOIS INSURANCE FRAUD STATUTE**

136.    A person commits insurance fraud in violation of Illinois law when they use deception to obtain the property of an insurance company (i.e., money) by making a false claim, with the intent to permanently deprive the insurance company of the use and benefit of that property.  *See* 720 ILCS 5/17-10.5(a)(1).

137.    A "false claim" is one that "conceals (i) the occurrence of an event that is material to any person's initial or continued right or entitlement to any insurance benefit or payment or (ii) the amount of any benefit or payment to which the person is entitled."  720 ILCS 5/17-10.5.

138.    A "false claim" also includes "any statement made to an insurer . . . made as part of, or in support of a claim for payment . . . and contains any false, incomplete, or misleading information concerning any fact or thing material to the claim."  *See Vertex Ref., NV, LLC v. Nat'l*

*Union Fire Ins., Co. of Pittsburgh, PA*, 2017 U.S. Dist. LEXIS 107312, No. 16 CV 3498, at *8–9 (N.D. Ill. July 11, 2017) (Pallmeyer, D.J.).

139.   "Statement" is defined as any assertion—oral, written, or otherwise—and includes, but is not limited to, any notice, letter, invoice, bill for services, diagnosis or prognosis, medical record, or any other data in any form. 720 ILCS 5/17-10.5.

140.   A person who commits insurance fraud "shall be civilly liable to the insurance company . . . in an amount equal to either 3 times the value of the property wrongfully obtained or, if no property was wrongfully obtained, twice the value of the property attempted to be obtained . . . plus reasonable attorney's fees." 720 ILCS 5/17-10.5(e)(1).

## V.   FACTUAL ALLEGATIONS COMMON TO ALL ALLEGATIONS

### A.   IMPACT OF DEFENDANTS' SCHEME TO DEFRAUD ON ALLSTATE

141.   Allstate insures motor vehicles in the State of Illinois.

142.   Providers of healthcare services can bill Allstate directly under applicable policies of insurance.

143.   Providers of healthcare services routinely submit bills and in some cases liens to Allstate in connection with bodily-injury claims made by Allstate claimants.

144.   The Defendants sought to bolster the appearance of injury to Allstate claimants by routinely prescribing clinically unwarranted (a) courses of physical therapy and chiropractic treatment, (b) pain management consultations, (c) surgical injections and other pain management procedures, (d) DME, and (e) prescription medication regardless of their ages, injury histories, and comorbidities.

145. The Defendants treated the Allstate claimants pursuant to a predetermined treatment protocol regardless of their individual medical needs.

146. The Defendants fraudulently billed Allstate for the healthcare services when the Defendants falsely represented to Allstate that the healthcare services were rendered and/or dispensed to Allstate claimants pursuant to Illinois law.

147. The Defendants fraudulently billed Allstate for healthcare services when the Defendants did not render or dispense the healthcare services and/or render or dispense the healthcare services as represented in the records and bills.

148. The Defendants fraudulently billed Allstate for healthcare services when Defendants falsely represented to Allstate that the healthcare services were medically necessary and prescribed by independent healthcare professionals hired and retained directly by the Allstate claimants.

149. In reasonable reliance on the Defendants' material representations, Allstate issued payments to or for the benefit of the Defendants.

**B.     STRUCTURE OF THE DEFENDANTS' SCHEME TO DEFRAUD**

150. Dr. Vandenelzen owns and operates a network of healthcare facilities in Illinois. The entities that comprise the network include Advanced Care, Advance Holdings, ASR, Metro, Midwest, and Promedix (hereinafter referred to collectively as the "Vandenelzen healthcare businesses").

151. On information and belief, the Vandenelzen healthcare businesses share common bank accounts, management, employees, and practices and procedures.

152.    Dr. Vandenelzen employs chiropractors, nurses, physicians and pharmacists to work at the Vandenelzen healthcare businesses.

153.    Dr. Vandenelzen exercises supervisory responsibility over the chiropractors that work at ASR.

154.    Dr. Vandenelzen exercises supervisory responsibility over the nurses and physicians that work at Metro.

155.    Dr. Vandenelzen exercises supervisory responsibility over the pharmacists that worked at Advanced Care and that work at Promedix.

156.    Dr. Vandenelzen has authority and responsibility for hiring and terminating employees and/or independent contractors of the Vandenelzen healthcare businesses, including chiropractors, medical doctors, nurses, pharmacists, and other clinical and administrative staff members.

157.    The Vandenelzen healthcare businesses and others participated in a scheme that was devised to exploit the medical expense and bodily-injury coverages available to their customers by billing for (1) unlicensed ambulatory surgery center fees; (2) unlicensed DME fees; (3) treatment not rendered; (4) unlawful referrals and prescriptions; (5) unnecessary healthcare services provided pursuant to a predetermined treatment protocol; and (6) at grossly excessive rates.

158.    The Defendants perpetrated their scheme by giving the appearance that the Vandenelzen healthcare businesses were legitimate companies in the business of providing healthcare.

159. The Defendants' goal was not the legitimate treatment and care of patients but rather to bill for as many healthcare services as possible, regardless of whether the healthcare services are medically necessary or lawful.

160. As set out below, the Defendants fraudulently billed for healthcare services in connection with Allstate claimants.

## C. BILLING FOR SERVICES AND PRODUCTS THAT ARE NOT MEDICALLY NECESSARY

161. The Defendants participated in an improper referral scheme resulting in illegal kickbacks, and overutilization of health services.

162. The vast majority of Allstate claimants purportedly treated by the Defendants appeared to have sustained soft-tissue type injuries and had no objective documented deficits to substantiate the predetermined treatment protocols and referrals for excessive testing and repeated treatments that they did not need.

163. The records indicate extensive use of physical therapy, chiropractic, diagnostics, injections, DME, and prescribed medications. These treatments were utilized broadly and indiscriminately, without regard for presenting complaint, noted progress, patient age, diagnosis or severity.

164. The records are cursory, incomplete, and conflicting. Additionally, there is no meaningful assessment of patient response to the physical therapy, prescribed medications, DME, and injections, nor is there any alteration of treatment following these interventions. In sum, the totality of the purported care provided to the patients by employees of the Vandenelzen healthcare businesses was medically unnecessary, unsubstantiated, excessive, and duplicative.

165. The Defendants referral scheme is coordinated and operated by and through Dr. Vandenelzen.

166. The scheme begins when Dr. Vandenelzen and the Vandenelzen healthcare businesses contract with medical doctors and others, for the purpose of procuring and sharing patients by way of mutual cross-referrals to increase their profits.

167. A true and accurate excerpt of Medical Doctor 2's testimony is depicted below:

> 19    Q. Do you ever refer patients to
> 20 Dr. Vandenelzen's clinics?
> 21    A. Yes.
> 22    Q. And he refers patients to you for pain
> 23 management and you refer patients to him for
> 24 chiropractic care?

*    *    *

> 1    A. Yes.

168. Based upon the evidence gathered during Allstate's investigation, the Vandenelzen healthcare businesses, at the direction of Dr. Vandenelzen, induce physicians, like Medical Doctor 2, to participate in the scheme by (1) paying kickbacks and splitting fees; (2) providing them access to a pool of Vandenelzen healthcare patients; (3) utilizing the employees and staff of Metro and ASR, free of charge; (4) utilizing facility space at Metro and ASR, free of charge, for the purpose of consulting and treating patients; and/or (5) by "renting" space owned by Dr. Vandenelzen and/or

Western, LLC for the purpose of treating patients at significantly lower prices than the market rate, and paid only to create the illusion of legitimacy.

169.     All of the bills submitted by the Defendants through the U.S. Mail seeking payment for unlicensed, unlawful, and/or medically unnecessary services are fraudulent.

       1.     **Unnecessary Services at ASR**

170.     The Defendants submitted bills for unnecessary services at ASR to Allstate.

171.     On information and belief, Dr. Vandenelzen formed the real estate business, Western, LLC to obfuscate that he is the true owner of the buildings that house the Vandenelzen healthcare businesses at the Western Avenue and Laramie Avenue locations, and to disguise kickback and profit-sharing payments to and from medical doctors and others in exchange for referrals and profit-sharing, as rent.

172.     As set out, Dr. Vandenelzen operates ASR, which has two chiropractic clinics - one at the Western Avenue location and one at the Laramie Avenue location.

173.     Dr. Vandenelzen purportedly hires or contracts with chiropractors to examine and treat Allstate claimants at ASR.

174.     ASR's patients are given a brief examination by a chiropractor, and then immediately referred for physical therapy – to be performed at ASR.

175.     The physical therapy referrals helped propel this scheme because the referral and resulting treatment created a false impression of the patients' actual injuries.

176.     The physical therapy referrals also generated a steady stream of revenue for ASR because patients were given the same treatment plans, which called for numerous office visits over many weeks.

177.    Based upon the evidence gathered during Allstate's investigation, the physical therapy services were profitable because ASR employed unlicensed assistants to provide physical therapy services instead of licensed Physical Therapists or licensed Physical Therapist Assistants as required under the Illinois Physical Therapy Act (225 ILCS 90/2). ASR concealed this fact by leaving the assistants' name off the records and bills.

178.    Based upon the evidence gathered during Allstate's investigation, Dr. Vandenelzen trained and instructed the chiropractors affiliated with ASR to utilize unlicensed persons to perform physical therapy services to Allstate claimants.

179.    The Defendants submitted fraudulent bills to Allstate for unnecessary services at ASR.

### 2.    Unnecessary/Unlawful Consultations

180.    The Defendants caused Allstate to be billed for unnecessary consultations.

181.    Based upon the evidence gathered during Allstate's investigation, Dr. Vandenelzen trained and instructed the chiropractors affiliated with ASR to refer new patients to pain management medical doctors who agreed to participate in the Defendants' referral and fraud scheme, regardless of whether the referral and subsequent consultations and procedures were medically necessary.

182.    The scheme was fueled by the consultations purportedly performed on Allstate claimants by the participating medical doctors.

183.    The consultations were always brief and insubstantial.

184.    The consultations misrepresented and omitted material facts about the nature and extent of the consultations.

185.     Based upon the evidence gathered during Allstate's investigation, the participating physicians predominantly used these consultations to fabricate reasons to prescribe unnecessary medication, DME, services, and procedures.

186.     Based upon the evidence gathered during Allstate's investigation, in exchange for the patient referrals and/or the use of Dr. Vandenelzen's medical facilities and staff, and/or payments, the participating physicians would reciprocate by referring Allstate claimants to Dr. Vandenelzen's other businesses, whether the additional medications, DME, and procedures so ordered were medically necessary.

### 3.     Unnecessary Medications

187.     The Defendants submitted bills for unnecessary medications to Allstate.

188.     The participating medical doctors, routinely prescribed the following medications: Lidocaine 5% ointment and patches; Diclofenac 3% cream; and Ondansetron.

189.     These medications were medically unnecessary. Lidocaine 5% ointment and patches are topical analgesics, which are used for temporary relief.  They are not a first-line treatment for musculoskeletal pain; rather, they are indicated for temporary pain relief for minor burns, skin abrasions, and insect bites.

190.     Indeed, the product labeling for Lidocaine 5% ointment confirms that the drug is not effective when applied on intact skin, because Lidocaine 5% ointment is incapable of sufficiently penetrating intact skin.

191.     The Allstate claimants that were prescribed Lidocaine 5% ointment and patches did not have any documented minor skin conditions or true neuropathic pain warranting Lidocaine 5% ointment.

192.    Indeed, the Lidocaine ointment and patches billed by Advanced Care and Promedix were ineffective and unnecessary because the drug is not proven to be safe or effective for treating deep joint pain in areas such as the shoulders or back.

193.    Moreover, Lidocaine 4% patches and creams are available over-the-counter and at a fraction of the cost—a package of 15 Lidocaine 4% patches (e.g., Salonpas patches) can be purchased at a neighborhood drug store without a prescription for approximately $25.00. Advanced Care and Promedix, however, billed Allstate claimants hundreds of dollars for the prescriptions.

194.    None of the Lidocaine 5% ointment and patches billed by the Defendants through Advanced Care and Promedix were necessary, including those identified in Exhibit 1.

195.    Diclofenac 3% solution is also medically unnecessary, nor indicated for the treatment of musculoskeletal injuries.  Like Lidocaine patches, there are lower priced alternatives available over-the-counter.

196.    None of the Diclofenac 3% solution billed by the Defendants through Advanced Care and Promedix were necessary, including those identified in Exhibit 2.

197.    While topical drugs may be appropriate in select cases (when oral medications are tried but fail; or when the patient is incapable of swallowing pills), Advanced Care and Promedix still bill for these drugs when none of these special circumstances were available.

198.    Medical Doctor 2 routinely prescribed Allstate claimants Ondansetron, which is generally prescribed to prevent nausea and vomiting caused by chemotherapy and radiation therapy as a precursor to providing Allstate claimants pain injections. The injections are discussed in further detail below.

199.    It is not medically necessary to routinely prescribe Ondansetron for patients undergoing pain injections.

200.    Moreover, Medical Doctor 2 purportedly prescribed a 30-day supply of Ondansetron to Allstate claimants without any documentation of any history of symptoms that would justify the medication.

201.    Even if the Allstate claimants reported such symptoms, it is common for a physician to prescribe a 2 day supply, not a 30 day supply.

202.    None of the Ondansetron billed by the Defendants through Advanced Care and Promedix were necessary, including those identified in Exhibit 3.

203.    Dr. Vandenelzen, and the pharmacists affiliated with Advanced Care, and Promedix, guaranteed that participating physicians, like Medical Doctor 2, would automatically send prescriptions to the Vandenelzen businesses by providing the participating physicians with pre-printed prescription forms for medication and DME.

204.    The preprinted prescription forms for medication contain Advanced Care's name, address, and telephone and fax numbers, as set out in the example below:



**Advanced Care Rx LLC**

11422 S Western Ave, Suite 101
CHICAGO, IL 60643
Tel: 312-462-0071 • Fax: 312-858-4341

**Pharmacy Prescription, (telephone)**

205.    It is unprofessional and unethical conduct by a pharmacy or pharmacist licensee to directly or indirectly furnish to a medical practitioner prescription order-blanks that refer to a specific pharmacist or pharmacy in any manner. *See* Ill. Admin. Code tit. 68 § 1330.30(l).

206.    It is unprofessional and unethical conduct by a pharmacy or pharmacist licensee to actively or passively participate in any arrangement or agreement in which a prescription order-blank is prepared, written, or issued in a manner that refers to a specific pharmacist or pharmacy. *See* Ill. Admin. Code tit. 68 § 1330.30(m).

207.    Based upon the evidence gathered during Allstate's investigation, the participating physicians' true purpose in writing the medication prescriptions (on the unlawful preprinted forms) was not to alleviate alleged claims of pain by the patients, but so Dr. Vandenelzen, Advanced Care, and Promedix could bill for medication, regardless of whether the medication was actually dispensed by a licensed pharmacist and/or medically necessary.

208.    Based upon the documentation submitted to Allstate by the Defendants, the participating medical doctors intentionally sent the prescriptions directly to Advanced Care, and its successor, Promedix, thus eliminating the referred patients' choice of pharmacy.

209.    The patients were not given the opportunity to have the prescription filled elsewhere because the participating physicians delivered the preprinted prescription forms directly to Advanced Care and/or Promedix.

210.    In fact, Advanced Care and now Promedix are located inside the Western Avenue office of ASR.  Only patients of ASR or the participating medical doctors have direct access, and are serviced. Advanced Care and now Promedix are closed to the general public.

211. As a result, Advanced Care and/or Promedix are guaranteed a steady stream of business, and the opportunity to bill for several unnecessary prescription medications at inflated prices.

212. It is unlawful for a pharmacist or pharmacy to pay or promise to pay to an owner, operator, or employee of a healthcare facility any valuable consideration for prescriptions to patients of such facilities. 225 ILCS 85/23.

213. Neither Advanced Care, Promedix, nor the participating pharmacists and/or physicians told the patients how much Advanced Care and Promedix would charge for the medication.

214. Based upon the evidence gathered during Allstate's investigation, if the medication prescriptions are, indeed, filled, an employee of Advanced Care, Promedix, and/or ASR would either hand the prescription medication directly to the patients while the patients are visiting the Western Avenue address or mail the prescription medication to the patients' home.

215. Based upon the evidence gathered during Allstate's investigation, employees and staff of Advanced Care, Promedix, and/or ASR, who are not licensed pharmacists or medical doctors dispensed prescription medication to patients in violation of Illinois and Federal laws.

216. Prior to dispensing a prescription to a new patient, or a new prescription to an existing patient, a pharmacist "shall provide verbal counseling to the patient or patient's agent on pertinent medication information." Ill. Admin. Code tit. 68, § 1330.700(a).

217. Based upon the documentation submitted to Allstate by the Defendants, no pharmacist employed by or otherwise affiliated with Advanced Care and/or Promedix "counsels" patients before medications are dispensed to them.

218.    Based upon the evidence gathered during Allstate's investigation, Advanced Care and Promedix, in agreement with the participating medical doctors, conceal their relationship with each other, and/or Dr. Vandenelzen, from their patients.

219.    The Defendants submitted fraudulent bills to Allstate for unnecessary medications; and medications that were no dispensed as represented – if at all.

### 4.    Unnecessary DME

220.    The Defendants submitted bills for unnecessary DME to Allstate.

221.    Based upon the evidence gathered during Allstate's investigation, in exchange for the patient referrals and/or the use of Dr. Vandenelzen's medical facilities and staff, and/or payments, the participating medical doctors wrote DME prescriptions for the referred patients, often on preprinted prescription forms provided to them by Dr. Vandenelzen, Midwest, and/or their employees and agents.

222.    The preprinted DME prescription forms have the fax number used by ASR and Midwest, printed at the top.



PHYSICIAN'S PRESCRIPTION
F: 708-377-5704

223.    Based upon the evidence gathered during Allstate's investigation, the participating physicians' true purpose in writing the DME prescriptions (on the preprinted forms) was not to alleviate alleged claims of pain by the patients, but so Dr. Vandenelzen, Midwest, and/or their

employees and/or agents could bill for the DME, whether the DME was actually dispensed by Midwest, whether it was medically necessary, and at exorbitant rates for monetary gain.

224.    Based upon the documentation submitted to Allstate by the Defendants, the participating medical doctors then automatically sent the prescription for DME to Midwest, thus removing the referred patients' choice.

225.    Based on information provided by Allstate claimants, neither Midwest nor the participating medical doctors advised the patients how much the DME would cost to purchase or rent.

226.    Based upon the documentation submitted to Allstate by the Defendants, neither Midwest nor the participating physicians advised the patients that they may purchase or rent the DME from their own pharmacy or another retail store.

227.    As a result, Midwest is guaranteed a steady stream of business, and the opportunity to bill for the rental or sale of multiple, often unnecessary DME at inflated prices.

228.    Based upon the documentation submitted to Allstate by the Defendants, Midwest then delivers DME to the patients while the patients are visiting the Western Avenue address or ships the DME to the patients' homes.

229.    The Defendants submitted fraudulent bills to Allstate for unnecessary DME.

    **5.    Unnecessary Facility Fees**

230.    Based upon the evidence gathered during Allstate's investigation, Midwest and the participating physicians concealed their relationship with each other, and the Dr. Vandenelzen entities, from the patients.

231.     Based upon the evidence gathered during Allstate's investigation, in exchange for the patient referrals and/or use of medical facilities and staff, participating medical doctors also sent the referred patients back to ASR, with the recommendation that the referred patients undergo or continue to undergo physical therapy for 2-3 days a week, for 4-6 weeks, and beyond.

232.     Based upon the evidence gathered during Allstate's investigation, participating physicians, like Medical Doctor 2, are further rewarded for their participation in the scheme by being invited – free-of-charge – by Dr. Vandenelzen to utilize Metro's surgical facilities and staff, to perform and bill for often unnecessary medical procedures on the referred patients, if the patients acquiesce.

233.     Based on information provided by Allstate claimants, neither Metro nor the participating medical doctors told the patients how much the procedure(s) would cost.

234.     Based on information provided by Allstate claimants, neither Metro nor the participating medical doctors told the patients how much Metro would charge them for facility fees.

235.     Based upon the evidence gathered during Allstate's investigation, the participating medical doctors did not tell the patients that they could have the procedures performed in the participating medical doctors' offices.

236.     Based upon the evidence gathered during Allstate's investigation, Metro and the participating medical doctors concealed the relationship they had with Dr. Vandenelzen, and each other, from the referred patients.

237.     Based upon the evidence gathered during Allstate's investigation, by offering to host surgical procedures at the Metro facility to the participating medical doctors, free of charge,

Metro was guaranteed a steady stream of referral business from the participating medical doctors, and the opportunity to bill the patients for often unlawful and unnecessary facility fees, and at exorbitant prices.

238.    The Defendants submitted fraudulent bills to Allstate for unnecessary facility fees.

### 6.    **Unnecessary Injections**

239.    Pain injections performed at Metro on Allstate claimants were performed by participating medical doctors, including Medical Doctor 1 and Medical Doctor 2.

240.    Pursuant to Medical Doctor 2, he did not pay Metro to utilize its facilities and staff.

241.    A true and accurate depiction of Medical Doctor 2's testimony in this regard is set forth below:

> 5    Q.   So when you started doing procedures in
> 6  like 2021 up until today, when you used the facility
> 7  at Metro North to do procedures, do you rent the
> 8  space, the operative space there?
> 9    A.  No, no.

242.    Instead, Metro would bill Allstate claimants for use of the space and staff.  Neither Metro, nor or the participating medical doctors informed the patients how much Metro would charge them.

243.    Dr. Vandenelzen, however, testified that on top of charging Allstate claimants a facility fee, he also charged Medical Doctor 2 rent to use Metro for the procedures. On information

and belief, this purported rental payment is actually a way for Dr. Vandenelzen to obfuscate a fee-splitting arrangement with Medical 2.

244.    A true and accurate depiction of Dr. Vandenelzen's testimony in this regard is set forth below:



245.    The pain injection procedures were prescribed, ordered, and performed before the Allstate claimants had an opportunity to respond to conservative treatment.

246. The pain injection procedures included facet injections and epidural steroid injections.

247. The pain injection procedures were excessive, unwarranted, and medically unnecessary because the condition of the Allstate claimants did not warrant invasive interventions.

248. The participating medical doctors billed for pain injection procedures frequently and without medical justification; in fact, participating medical doctors repeatedly ordered and billed for the pain injection procedures even though there was no objective evidence showing effectiveness of the injections or improvement in the patients' condition following the injections.

249. Participating medical doctors subjected Allstate claimants to injections regardless of their presenting complaints or diagnoses. Often the Allstate claimants who were purportedly treated with injections did not have subjective complaints that would warrant such injections.

250. Allstate claimants were needlessly subjected to unnecessary, dangerous, and powerful doses of anesthesia while undergoing injections at Metro.

251. Based upon the evidence gathered during Allstate's investigation, neither Metro nor the other participating medical doctors notified their patients that Metro is an unlicensed ambulatory surgical and treatment center.

### D. UNLAWFUL OPERATION OF AN AMBULATORY SURGICAL CENTER

252. The Defendants (through Metro) submitted bills for unlicensed ambulatory surgical center facility fees.

253. Metro operates as an ambulatory surgical treatment center, and thus is subject to licensing requirements in the State of Illinois.

254. Participating physicians use Metro, free of charge, to perform surgical procedures on their patients.

255. Metro operates exclusively for the purpose of providing surgical procedure services.

256. Metro does not have the requisite license under the ASTCA, 210 ILCS 5 *et seq.*, and therefore is unlawfully hosting surgical procedures in the State of Illinois.

257. Despite being unlicensed, Metro held itself out to be a licensed surgical treatment center in violation of Illinois law.

258. A true and accurate copy of Metro's signage is depicted below:



259. A person or facility not licensed as an ambulatory surgical treatment center pursuant to the ASTCA "shall not hold itself out to the public as a 'surgery center' or as a 'center for surgery[.]'" 210 ILCS 5/6.

260. Further under the 77 Ill. Adm. Code 205.110, an ambulatory surgical center is defined as (a) any place devoted to surgery and (b) any place that meets or complies with the

definition of an ambulatory surgical center under the ASTCA and the licensing requirements under 77 Ill. Adm. Code 205.110 (which is evidenced by surgical procedures constituting more than 50% of the facility's activities), or (c) any place that meets the definition of an ambulatory surgical center under Medicare/Medicaid rules.

261. An ambulatory surgical center is defined under Medicare/Medicaid as a "distinct entity that operates exclusively for the purpose of providing surgical services to patients not requiring hospitalization and in which the expected duration of services would not exceed 24 hours following the admission."

262. In the absence of a license to operate under the ASTCA, Metro cannot charge a facility fee for these services.

263. Nevertheless, to avoid the State oversight and requirements inherent with operating a duly licensed ambulatory surgery center, Dr. Vandenelzen, with the assistance of others, operated Metro without a license in violation of the ASTCA throughout the course of this scheme under the guise that Metro is exempt from licensure.

264. Dr. Vandenelzen has misrepresented that Metro fits within an ASTCA licensure exemption by claiming that it operates as a non-emergency office-based facility.

265. True and accurate excerpts of Vandenelzen's testimony in this regard are depicted below:

> 17   Q   Regarding the issue of the ambulatory care
> 18 center licensure in Illinois, what is your
> 19 understanding as to why you do versus don't have one?
> 20   A   I didn't have -- or I wasn't the ambulatory
> 21 based surgical center because it wasn't -- or it's not
> 22 an emergency-based facility.  Also, the -- we -- we
> 23 see -- see patients there occasionally.  So the -- the
> 24 ambulatory center was a lot more -- or the -- the

*     *     *     *

> 1 credentialing process was just a lot different.
> 2   Q   Do you hold out your surgery center as an
> 3 ambulatory care center or something different?
> 4   A   Is what -- sorry?
> 5   Q   Do you hold out or represent your surgery
> 6 center as an ambulatory care center, or do you hold it
> 7 out as something different?
> 8   A   Oh, it's -- it's an office based -- office
> 9 based facility.

266.   In Illinois, a facility is not considered an ambulatory surgical center and is exempt from the ASTCA's licensing requirements if it is operated within the practice of a licensed physician or group of physicians.

267.   Dr. Vandenelzen is a licensed chiropractor.

268.    Dr. Vandenelzen practices chiropractic at ASR.  He does not practice chiropractic at Metro.

269.    Pursuant to Illinois law, it is beyond the scope of chiropractic practice and, therefore, illegal for chiropractors to treat patients with operative surgery or with the use of drugs. 225 ILCS 60/2.

270.    Metro is exclusively owned by Dr. Vandenelzen.  His ownership and control of Metro is a violation of the Medical Practice Act and the corporate practice of medicine doctrine.

271.    Medical Doctor 1 and Medical Doctor 2 do not have an ownership interest in Metro.

272.    According to Dr. Vandenelzen, Medical Doctor 1 was, and Medical Doctor 2 is, the medical director of Metro. Based upon the evidence gathered during Allstate's investigation, Medical Doctor 1 and Medical Doctor 2 were never involved in the direction or management of the surgical center.

273.    Dr. Vandenelzen is aware of the licensure requirement for surgery centers.

274.    The "office-based" versus "surgery center" distinction is important since an office-based facility is considered an extension of the medical doctor's practice.

275.    In other words, Metro could legally only provide the injections in an unlicensed office-based setting if the injections were administered to its patients by medical doctors that were part of Metro's practice.

276.    The Defendants never met this requirement.

277.    Medical Doctor 1 and Medical Doctor 2, and the other participating medical doctors who performed surgical procedures at Metro, own and operate their own independent medical

practices elsewhere, and the procedures they perform at Metro were unrelated to any office-based center.

278.    While Medical Doctor 1 and Medical Doctor 2, and the other participating medical doctors were allegedly practicing medicine at Metro when administering the injections, the physical location at which a doctor practices medicine does not qualify it as a medical practice. "Physicians may have a medical practice at an office; when they treat patients at a hospital, they are practicing medicine, but their medical practice has not moved from the office to the hospital. A hospital is merely a necessary tool of the practice. Similarly, if physicians made house calls to visit patients, they would be practicing medicine at patients' homes, but their medical practice does not thereafter include the patients' homes." *Joliet Med. Group, Inc. v. Ensiminger*, 337 Ill. App. 3d 1076, 1079 (2003).

279.    Metro is not a medical practice in and of itself.  It has no patients of its own.  The participating medical doctors who utilize Metro to administer pain injections do not examine or treat patients on behalf of Metro.  Instead, the participating medical doctors direct their patients to Metro to undergo surgical procedures.  The patients have no further contact with Metro unless referred there for another surgical procedure.

280.    Indeed, the Allstate claimants that purportedly received facet joint injections and epidural injections at Metro never had a patient-provider relationship with Metro.

281.    Although Medical Doctor 1 and Medical Doctor 2 were purportedly hired to be the Medical Director of Metro for a period of time, they were not hired by Dr. Vandenelzen to examine patients and/or perform surgical procedures on patients on Metro's behalf.  Their role as a Medical Director, at best, was administrative only – if at all.

282.     Crucially, a facility does not qualify for this licensure exemption if the facility is used by providers who are not part of the practice.

283.     Moreover, an office-based facility does not qualify for the licensure exemption if surgical procedures constitute more than 50 percent of the facility's activity. *See* 77 Ill. Adm. Code 205.110.

284.     According to Medical Doctor 2, ***100 percent*** of Metro's activities are for surgical procedures.

285.     True and accurate excerpts of Medical Doctor 2's testimony are depicted below:

> 16      Q.   I mean is that like 100 percent of what's
> 17   done there is like these outpatient procedures,
> 18   whether it be pain management or knee arthroscopies,
> 19   like that?
> 20      A.   Yeah, procedures, yeah.
> 21      Q.   Generally speaking it's not a place where
> 22   you're treating, examining patients, it's a place
> 23   where people go in and get procedures done, correct?
> 24      A.   Yeah.

*       *       *

> 1      Q.   And you have other offices that you
> 2   primarily see and treat and examine patients?
> 3      A.   Yes.
> 4      Q.   And when you do procedures, like pain
> 5   management procedures, you go to an out-patient
> 6   facility like Metro North?
> 7      A.   Yes.

286. Simply put, Metro is not permitted to operate without a license, and does not meet the requirements of the "office-based" licensure exemption.

287. Even if Metro qualified as an office-based surgery center, it could not charge for a separate facility fee in connection with an office-based procedure.

288. Regardless, Dr. Vandenelzen, Metro, and their employees and agents, regularly asserted healthcare liens pursuant to Illinois Health Care Services Lien Act 770 ILCS § 23/5 ("Lien Act") to secure payment for services purportedly provided to Allstate claimants at Metro.

289. The Lien Act allows medical providers to assert a lien against "all claims and causes of action of the injured person" to secure future payment of the provider's "reasonable" charges.

290. Dr. Vandenelzen, Metro, and their employees and agents, however, misrepresented that Metro is a duly licensed ambulatory surgery center that qualified as a "health care provider," under the Lien Act on the face of the healthcare liens that it submitted to secure payment.

291. A true and accurate copy of a Metro healthcare lien is depicted below:



292.     Despite not possessing the requisite license, Metro falsely represented that it was "duly licensed."

293.     Despite not possessing the requisite license, Metro unlawfully billed for surgical facility fees.

294.     A true and accurate representative sample of a Metro facility fee is depicted below:



295.    When recently challenged on their illegal operation of a surgery center, Dr. Vandenelzen and Medical Doctor 2 testified that Metro is exempt from the ASTCA's licensing requirements because Metro was accredited by The Joint Commission, and that Metro's purported Joint Commission accreditation is the reason why Metro can still bill surgical facility fees.

296.    The Joint Commission is an independent, nonprofit organization that evaluates and accredits health care organizations and programs in the United States.

297.    Even if exempt from licensure, Metro however, cannot avail itself of the Lien Act's provision for accredited facilities because Metro does not actually meet the criteria for accreditation under the Joint Commission's own standards.

298.    To receive accreditation from The Joint Commission, a facility must apply and comply with various standards and policies set forth by The Joint Commission in its Standards and Checklist for Accreditation of Office-Based Facilities.

299.     By way of example, to be eligible for accreditation, the organization or practice applying for the accreditation must be "licensed to conduct its scope of services."[6]  Metro does not meet this criterion.

300.     In addition, "[t]he organization or practice must be surgeon-owned or surgeon-operated."  Again, Metro does not meet this criterion.

301.     Based upon the evidence gathered during Allstate's investigation, Metro misrepresented in its Joint Commission application that it was owned and/or operated by a surgeon under the proposition that Metro is a medical corporation, pursuant to the Medical Corporation Act (805 ILCS 15) ("MCA").  Metro, however, was formed exclusively by Dr. Vandenelzen, who has facilitated the rendering of surgical procedures and treatment with drugs - that goes far beyond the "category of services" he is licensed to perform.  805 ILCS 10/3.4.

302.     Based upon the evidence gathered during Allstate's investigation, Dr. Vandenelzen, Metro and others intentionally concealed that Metro was, in fact, owned exclusively by a chiropractor from The Joint Commission.

303.     Pursuant to The Joint Commission, an accredited facility must also employ a Medical Director that is actively involved in the direction and management of the facility who must possess an M.D. or D.O. degree and is licensed as a physician in the state in which the facility is located.

_____

[6] "Office-Based Surgery (OBS) Accreditation Program Fact Sheet." *jointcommission.org*. Accessed July 16, 2024.   https://www.jointcommission.org/resources/news-and-multimedia/fact-sheets/facts-about-office-based-surgery-accreditation/.

304. Based upon the evidence gathered during Allstate's investigation, Metro misrepresented in its Joint Commission application that it lawfully employed medical doctors to be its Medical Directors, when to do so would be a violation of the corporate practice of medicine doctrine and the MPA, as set out above.

305. More importantly, Medical Doctor 2 has recently admitted that he never acted as the Medical Director for Metro.

306. Dr. Vandenelzen, however, informed the Joint Commission that Medical Doctor 2 was, indeed, Metro's Medical Director since 2024, the same year the Joint Commission reinspected Metro.

307. Pursuant to 225 ILCS 60/22(A)(11), a medical doctor's license may be revoked or suspended if they allow another person or organization, like Metro, to use their license to practice.

308. Based upon the evidence gathered during Allstate's investigation, Medical Doctor 2 was paid to be Medical Director in name only.

309. Dr. Vandenelzen recruited and installed Medical Doctor 2 to misrepresent to the public, the Joint Commission, and Allstate, that Metro was properly operated by licensed medical doctors.

310. When challenged of the very nature of Metro's relationship with Medical Doctor 2, Dr. Vandenelzen and Medical Doctor 2 contradicted one another.

311. By way of example, Dr. Vandenelzen testified that Medical Doctor 2 is his employee.

312. A true and accurate excerpt of Dr. Vandenelzen's testimony is depicted below:

> 6    Q    Okay. And the medical directors of Metro
> 7  North, are they employees of Metro North or are they
> 8  independent contractors? What's the relationship?
> 9      A    The relationship is they're essentially, I
> 10  guess, an employee of Metro North.
> 11    Q    They're paid by Metro North?
> 12    A    Correct.

313.    However, when Medical Doctor 2 testified, he denied there was an employer-employee relationship.

314.    A true and accurate excerpt of Medical Doctor 2's testimony is depicted below:

> 8    Q.    So are you an employee of Metro North?
> 9    A.    No, just an independent contractor.

315.    Medical Doctor 2 was evasive when asked if he was paid to be the Medical Director.

316.    Notably, Dr. Vandenelzen and Medical Doctor 2 are prohibited from splitting fees rendered at Metro pursuant to Section 22.2 of the MPA, which prohibits physicians and chiropractors from dividing, sharing, or splitting any professional fee or other form of compensation for professional services.

317.    A true and accurate excerpt of Medical Doctor 2's testimony is depicted below:

> 19   Q.  And do you get paid by Metro North in
> 20  that role as medical director?
> 21      A.  I believe I get a small payment now.

318.   When Dr. Vandenelzen was asked to identify the person responsible for ordering medication used in the surgical procedures at Metro, he testified it was the responsibility of the Medical Director.

319.   A true and accurate excerpt of Dr. Vandenelzen's testimony is depicted below:

> 3      Q   So Metro North goes out and purchases
> 4  medications, drugs, things like that?
> 5      A   Correct.
> 6      Q   Does Metro North have its own pharmacy?
> 7      A   No.
> 8      Q   Who purchases the prescription medications
> 9  that Metro North uses on these patients to do these
> 10 injection pain management procedures?
> 11     A   The -- whoever the medical director is
> 12 typically.

320.   Medical Doctor 2, however, denied that he was responsible for purchasing medication on Metro's behalf.

321.   A true and accurate excerpt of Medical Doctor 2's testimony is depicted below:

> 15    Q.  As the medical director now, do you have
> 16  anything to do with purchasing the drugs at Metro or
> 17  is that not your job?
> 18    A.  No, like my job is more of the clinical
> 19  side at Metro North, more like practice guidelines
> 20  and how we are setting up and running for pain and
> 21  anesthesia services there, not the billing or the
> 22  medication purchases and stuff like that.

322.    Based upon the evidence gathered during Allstate's investigation, if any medication is actually purchased and used during surgical procedures performed on patients at Metro, it is Dr. Vandenelzen, a chiropractor, and not an acting Medical Director, that orders the medication through his pharmacies, Advanced Care, and later, Promedix, in violation of Illinois law.

323.    The Defendants are motivated to mischaracterize the operation of Metro and disguise their illegal conduct because without Metro, participating medical doctors would charge only for the "professional component" of the injection procedures (i.e., the fee charged by the physicians for the cost of the physician's time in administering the injections)—fees that often ranged from $1,000.00 to $7,000.00 per procedure.

324.    However, by steering patients to Metro for injections, rather than performing the services at their own offices, Metro was given the opportunity to purportedly provide surgical facility services, which then allowed Dr. Vandenelzen and Metro to charge surgical facility fees.

325.    The surgical facility fees charged by Metro are grossly excessive.  The fees for each procedure range from $1,000.00 to $19,500.00, even though the procedures take just minutes to complete.

326.     Metro's invoices were purposefully vague, and provided no itemization, or explanation as to what warranted the grossly excessive charges for services it purportedly provides.

327.     The full extent of Metro's misrepresentations regarding the (lack of) licensure and its inability to lawfully bill for services to Allstate claimants was not known to Allstate until it undertook the full investigation that culminated in the filing of this action.

328.     In furtherance of the Defendants' scheme to defraud—Dr. Vandenelzen, Metro, their employees and agents, and participating medical doctors actively seek collection of payments for the unlawful services purportedly provided to Allstate claimants at Metro from 2020 to the present.

329.     Accordingly, if a professional business, including Metro, fails to meet any applicable licensing requirement necessary to perform a service, then the provider is not lawfully entitled to seek or collect the benefits from Allstate.

330.     The unlawful services billed by Metro includes, but is not limited to the services set out in the chart annexed hereto at Exhibit 18.

331.     All of the bills submitted by the Defendants through the U.S. Mail seeking payment from Allstate for surgical facility fees are fraudulent.

**E.     UNLAWFUL OPERATION OF A DME BUSINESS**

332.     The Defendants (through Midwest) submitted bills for the unlicensed dispensing of DME.

333.     Midwest does not possess the requisite license under the HME Licensure Act, and therefore, is unauthorized to distribute DME in the State of Illinois.

334.    Regardless, Dr. Vandenelzen and Midwest, by and through their employees and agents, have operated Midwest without a license in violation of Illinois law.

335.    Despite its lack of licensure, Dr. Vandenelzen, and Midwest, by and through their employees and agents, purportedly provided, and still provide, Allstate claimants with DME products, and purportedly perform related services, such as setting-up the DME and training Allstate claimants on the operation of the DME.

336.    Despite the lack of licensure, Dr. Vandenelzen and Midwest, by and through their employees and agents, routinely and unlawfully bill Allstate claimants for DME products, and related services.

337.    Dr. Vandenelzen and Midwest, and their employees and agents, are fully aware of the licensure requirement.

338.    On information and belief, Dr. Vandenelzen and Midwest, and their employees and agents, did not obtain a license to distribute DME/HME to avoid being regulated by the Illinois Department of Financial and Professional Regulations ("IDFPR") and/or to circumvent professional insurance requirements.

339.    Because it is unlicensed, Midwest is ineligible to submit payment for services it purportedly dispensed and/or rendered.

340.    The full extent of Midwest's misrepresentations regarding the (lack of) licensure, and its inability to lawfully bill Allstate claimants was not known to Allstate until it undertook the full investigation that culminated in the filing of this action.

341.    The unlawful services billed by Midwest, includes, but is not limited to, the services and patients set out in the chart annexed hereto at Exhibit 19.

-52-

342.    In furtherance of the Defendants' scheme to defraud, Dr. Vandenelzen and Midwest are actively seeking collection of payments for the unlawful distribution of DME/HME, supplies, and services purportedly provided to Allstate claimants.

343.    Accordingly, if a professional business, including Midwest, fails to meet any applicable licensing requirement necessary to perform a service, then the provider is not lawfully entitled to seek or collect the benefits from Allstate.

344.    All of the bills submitted by the Defendants through the U.S. Mail seeking payment from Allstate for unlicensed DME products and services are fraudulent.

F.    **BILLING FOR SERVICES NOT RENDERED**

1.    **Billing for Consultation Services That Were Not Performed as Represented**

345.    Medical Doctor 2 submitted bills to Allstate claimants seeking payment for consultations that were not conducted.

346.    Medical Doctor 2 has submitted false records and bills stating that he consulted with Allstate claimants on 3-4 visits before ultimately prescribing a surgical procedure to be performed at Metro, such as a facet joint injection, when one or more of the consultation visits did not occur.

347.    Based upon the evidence gathered during Allstate's investigation, records submitted by Medical Doctor 2 are fabricated sometime after Medical Doctor 2 actually meets with Allstate claimants at Metro to administer an injection.

348. Based upon the evidence gathered during Allstate's investigation, Allstate Claimants are often referred to Metro for pain injections by ASR employees and agents under the guise that Medical Doctor 2 made the recommendation and referral.

349. The first and only time Medical Doctor 2 consulted and/or examined some of the Allstate claimants is when they presented at Metro for the prescribed injection.

**2.** **Billing for DME That Was Not Distributed as Represented**

350. The Defendants (through Midwest) submitted bills to Allstate claimants seeking payment for DME that was not dispensed as represented.

351. Midwest, by and through Dr. Vandenelzen, its employees, and agents utilized the Healthcare Common Procedure Coding System (HCPCS) - a numeric coding system recognized by the Centers of Medicare and Medicaid Services to identify non-office physician services, such as DME distribution and related services when it submits bills to Allstate claimants.

352. For example, Allstate claimant A.U. (whose experience is discussed in greater detail below), confirmed that no one from Midwest set-up or trained her in the use of the DME dispensed to her by Midwest.

353. Midwest routinely submitted bills to Allstate claimants seeking payment for DME, and related services that were not rendered to the Allstate claimants as represented in Midwest's invoices and records.

354. The equipment dispensed by Midwest mostly consists of TENS units, which are home-portable electrical stimulation units.

355.    Midwest bills Allstate claimants $600.00 pursuant to HCPCS E0730, representing that it provides Allstate claimants with "[a] [t]ranscutaneous electrical nerve stimulation (tens) device, [with] four or more leads, for multiple nerve stimulation."

356.    A true and accurate representative sample of a Midwest invoice is depicted below:



357.    Midwest intentionally did not identify the make or model of the DME in its records or bills for the sole purpose of concealing the actual marketplace retail price, and Midwest's unconscionable markup.

358.    Based on information provided by Allstate claimants, Midwest provided Allstate claimants with a Health Herald Digital Therapy Machine that can be purchased from an online retailer for under $30.00.

359.    When Midwest bills Allstate claimants for a TENS unit or a back brace, Midwest also bills Allstate claimants an additional $100.00, as depicted above, pursuant to HCPCS A9901, representing that an employee of Midwest dispensed, set-up, and *trained* the Allstate claimant on

how to properly operate the DME, which includes advising the Allstate claimants about the applicable contraindications associated with the use of the DME.

360. On information and belief, Midwest, does not have its own employees or staff.

361. Instead, Midwest utilizes unidentified members of ASR's staff to distribute the DME to the Allstate claimants while they are visiting the Western Avenue branch of ASR.

362. In those cases, Midwest bills Allstate claimants for the alleged set-up and training performed by the co-opted ASR employees and staff, and then misrepresents that the ASR employees and staff are employees of Midwest.

363. In other cases, Midwest routinely has the DME shipped directly to the Allstate claimants, throughout Illinois, by way of Fed Ex, from a currently unknown entity, manufacturer, and/or vendor in Dallas, Texas.

364. A true and accurate representative example of a shipping label from an unknown entity in Texas is depicted below:



365.    In these cases, no one from Midwest or ASR does any sets-up or DME training with the Allstate claimants.

366.    By billing the Allstate claimants $100.00 for the set-up and training that did not occur, Midwest is billing for services that were not rendered.

367.    Midwest also purportedly dispenses lumbar back braces.

368.    Midwest bills Allstate claimants between $2,000.00, and $2,500.00 pursuant to HCPCS L0637, representing that a qualified "individual with expertise… trimmed, bent, molded, assembled, or otherwise customized" the lumbar-sacral orthosis (back brace) for the Allstate claimant.

369.     Midwest, however, does not identify the name or credentials of the person who purportedly had the requisite "expertise" that provides the back brace to the Allstate claimants.

370.     While Midwest periodically identified the lumbar back brace that it purportedly provided to Allstate claimants as an "Evergreen LSO," it failed to provide the model number in its records or bills.

371.     Similar back braces can be purchased from online retailers for less than $180.00.

372.     Midwest also rents Game Ready units to Allstate claimants.

373.     Generally, the Game Ready unit is a portable unit that delivers cold and compression therapies through a wrap that has circumferential coverage over the injured area purportedly being treated following surgery.

374.     The Game Ready requires a wrap, for which Midwest bills Allstate claimants an additional $300.00 pursuant to HCPCS E1399, representing that it provided the Allstate claimants with "[d]urable medical equipment, miscellaneous."

375.     As for the Game Ready unit itself, rather than provide the Allstate claimants with a new unit, which costs approximately $3,000.00, Midwest opts to rent the Game Ready unit to the Allstate claimants for eight weeks or more at an astounding $27,000.00 in rental fees pursuant to HCPCS E1399, again representing that it provides the Allstate claimants with miscellaneous DME equipment.

376.     All of the bills submitted by the Defendants through the U.S. Mail seeking payment from Allstate for DME not dispensed are fraudulent.

### 3. Billing for Therapeutic Exercises That Were Not Rendered as Represented

377. The Defendants (through ASR) submitted bills to Allstate seeking payment for therapeutic exercises that were not rendered as represented.

378. ASR, by and through its owners, Dr. Vandenelzen, Dr. Karban, and Dr. Durgut, submitted bills to Allstate claimants for physical therapy services.

379. Based upon the evidence gathered during Allstate's investigation, the physical therapy services were profitable because ASR employed unlicensed persons to provide physical therapy services instead of licensed providers.

380. Based upon the evidence gathered during Allstate's investigation, ASR intentionally adheres to a predetermined treatment protocol of overutilization of purportedly skilled physical therapy. Legitimate physical therapy treatment should be tailored to the individualized conditions of the patients.

381. The practice of chiropractic requires that the chiropractor tailor a plan of treatment to the individualized condition of the patient, taking into account his or her background health status, demographic information such as age and gender, as well as current symptoms.

382. The practice of chiropractic requires a diagnosed deficiency in strength, endurance, flexibility, or range of motion, to justify a prescription for therapeutic exercise.

383. Under the accepted standards for practice of chiropractic, in the vast majority of courses of treatment, a deficiency in strength, endurance, flexibility, or range of motion, would be addressed by a program of home exercise, not requiring any skilled assistance from the chiropractor.

384. Physical therapy includes, among other things, thermotherapy (such as use of heat and cold), electrotherapy (such as electrical muscle stimulation), mechanotherapy (such as massage or Kinesio taping), and exercise to improve strength, endurance, flexibility, and range of motion.

385. Exercise therapy is one intervention that may be prescribed by a chiropractor.

386. For exercise therapy to be billable by a chiropractor under applicable medical coding standards, the chiropractor must apply his or her skill, experience, and education to provide skilled, one-on-one assistance to the patient in determining when and how to perform such exercise, for a period of time that becomes the unit of measure for the service. The standard unit of time is 15 minutes.

387. Specifically, the American Medical Association publishes current procedural terminology codes (hereinafter "CPT Codes").

388. The Defendants (through ASR) submitted bills to Allstate for CPT Code 97110 that were not provided as required by the American Medical Association.

389. Under the accepted standards for the practice of chiropractic, even one unit of skilled one-on-one assistance with therapeutic exercise by the chiropractor, *i.e.*, fifteen minutes, is an intensive and significant investment of care, which would not be routine for a chiropractor to render to patients on every date of service.

390. The high degree of uniformity of extremely high utilization of purportedly-skilled one-on-one assistance with therapeutic exercise, purportedly by a chiropractor, and the remarkable uniformity of demands for payment of 15 minutes or more of the service on virtually every date

when treatment was reported, is demonstrative of a pre-determined treatment protocol at ASR that generated demands for payment of medically unnecessary services.

391.    ASR's chiropractors intentionally failed to tailor their chiropractic treatments to the individualized conditions of patients, resulting in intentional overutilization of purported skilled assistance with therapeutic exercise.

392.    Based upon the evidence gathered during Allstate's investigation, chiropractors employed at ASR delegated treatment of patients at ASR (including therapeutic exercises) to staff members, who are not licensed or skilled health care providers.

393.    ASR, by and through its owners, employees, and agents routinely submit bills to Allstate claimants seeking payment for physical therapy services that were not rendered to the Allstate claimants as represented in ASR's invoices and records.

394.    In instances when direct one-on-one supervision was provided to Allstate claimants, Allstate claimants and a past employee of ASR has confirmed that ASR chiropractors would delegate the task to ancillary staff.

395.    In these cases, the ASR chiropractors routinely billed patients $130.00 per unit (each unit being 15 minutes long) for therapeutic exercises pursuant to CPT code 97110 (including all those identified in Exhibit 4). By billing for the therapeutic exercises under CPT code 97110, ASR misrepresented that a physician or other qualified health care professional rendered one-on-one assistance to the Allstate claimants who were performing therapeutic exercises.

## VI.    EXEMPLAR CLAIMS

396.    Below is a representative sample of specific claim submissions that exemplify the Defendants' fraudulent scheme.

**Claimant: B.M.**
**DOL: September 29, 2017**
**Allstate Claim No.: 0477015077**

397.     On September 29, 2017, Allstate claimant, B.M., was reportedly involved in a motor vehicle accident in Chicago, IL.  As a result of the accident, B.M. reportedly sustained soft-tissue injuries to her neck, lower back, right hand, and bilateral knees.

398.     Although she initially declined emergency medical treatment at the scene of the accident, that same day, B.M. consulted with Medical Doctor 3.

399.     Medical Doctor 3 instructed B.M. to go to physical therapy at ASR, 2-3 times a week, for 4-6 weeks. Medical Doctor 3 worked in the same practice as Medical Doctor 1, the medical doctor who was purportedly the first Medical Director at Metro.

400.     Medical Doctor 3 also wrote B.M. the following six medication prescriptions:

- Protonix 20 mg;
- Tramadol 150 mg;
- Flexeril 7.5 mg;
- Meloxicam 15 mg;
- Lidocaine patches; and
- NSAID cream.

401.     When Medical Doctor 3 purportedly wrote the medication prescriptions, he did so on a pre-printed prescription form provided to him by Dr. Vandenelzen and/or Midwest.

402.     A true and accurate copy of the pre-printed medication prescription form utilized by Medical Doctor 3 is depicted below:

-62-



403.    Midwest is not a licensed pharmacy. By using the Rx symbol on its pre-printed prescription form, Midwest misrepresented that it was a licensed pharmacy in violation of Illinois law.

404.    Based upon the documentation submitted to Allstate by the Defendants, Medical Doctor 3 sent the above medication prescriptions directly to Midwest.

405.    Midwest billed B.M. $3,052.47 for prescription medication pursuant to CPT code 99070, falsely representing that an unidentified doctor dispensed the medication directly to B.M at the Western Avenue location of Midwest.

406.    CPT code 99070 should only be used to bill for supplies and materials provided by a *physician* over and above those routinely used during an office visit.

407.    A duly licensed pharmacy should bill the specific HCPCS codes for the medication dispensed.

408.    On information and belief, Medical Doctor 3 did not dispense the medication as represented by Midwest. Instead, an unlicensed employee or agent of Midwest, acting as a pharmacist and on Dr. Vandenelzen's behalf, dispensed the prescribed medication to B.M.

409. Dr Medical Doctor 3 also purportedly prescribed B.M. the following DME:

- A TENS unit;
- A lumbar brace; and
- A vascutherapy compression device.

410. When Medical Doctor 3 purportedly wrote the DME prescriptions, he did so on a pre-printed form provided to Medical Doctor 3 by Midwest.

411. A true and accurate example of a pre-printed DME prescription form is depicted below:



412. Midwest billed $468.25 pursuant to HCPCS E0730, representing that it provided B.M. with: "[a] [t]ranscutaneous electrical nerve stimulation (TENS) device, four or more leads, for multiple nerve stimulation."

413. Midwest did not identify the make or model of the TENS unit in its records or bills. Based on information provided by other Allstate claimants, B.M. was provided with a Health Herald 4-Mode Electric TENS, which may be purchased online for less than $30.00.

414. Midwest also billed B.M. $2,000.00 pursuant to HCPCS L0650, representing that it provided B.M. with:

> [a] [l]umbar-sacral orthosis (LSO), sagittal-coronal control, with rigid anterior and posterior frame/panel(s), posterior extends from sacrococcygeal junction to T-9 vertebra, lateral strength provided by rigid lateral frame/panel(s), produces intracavitary pressure to reduce load on

intervertebral discs, includes straps, closures, may include padding, shoulder straps, pendulous abdomen design, prefabricated, off-the-shelf.

415. While Midwest did identify the lumbar back brace that it purportedly provided to B.M. as an "Evergreen LSO" in its records, it failed to provide the model number.

416. Regardless, similar back braces can be purchased from retailers online for less than $180.00.

417. Midwest also rented B.M. a Game Ready unit for eight and a half weeks, during which Midwest billed B.M. an astounding $27,600.00 in rental fees over approximately seven weeks, pursuant to HCPCS E1399, representing that it provided B.M. with miscellaneous DME equipment.

418. Notably, a new Game Ready device currently costs $3,000.00.

419. Midwest also billed B.M. $100.00 pursuant to HCPCS A9901, representing that on October 2, 2017, an employee of Midwest set-up and trained B.M how to operate the DME.

420. No one employed at Midwest, however, dispensed, or set-up the DME for B.M.

421. Instead, on October 2, 2017, at the direction of Medical Doctor 3, B.M. presented to ASR for a physical therapy consultation. There, an employee of ASR purportedly provided B.M. with a TENS unit, a back brace, and a Game Ready unit.

422. Based on information provided by Allstate claimants, no one from Midwest trained B.M. on the operation of the DME.

423. At ASR, after a cursory examination, Dr. Vandenelzen and/or Dr. Durgut instructed B.M. to begin ASR's pre-determined physical therapy protocol, which every patient involved in a motor vehicle accident receives, regardless of their injuries, or whether it is medically necessary.

The pre-determined protocol includes therapeutic exercise, manual therapy, ultrasound, electric stimulation, heat, and kinesiology tape, for at least 2-3 times a week, for 4-6 weeks.

424. ASR billed B.M. $3,430.79 until B.M. self-discharged.

425. Based on information provided by Allstate claimants, Dr. Vandenelzen and Dr. Durgut delegated aspects of B.M.'s therapy to unlicensed employees of ASR.

426. By way of example, Dr. Vandenelzen and Dr. Durgut billed B.M. $94.46 per unit for therapeutic exercises (each unit lasting 15 minutes) pursuant to CPT code 97110, thereby falsely representing that Dr. Vandenelzen and/or Dr. Durgut provided B.M. with direct, one-on-one supervision during the exercises.

427. Based upon the evidence gathered during Allstate's investigation, Dr. Vandenelzen and Dr. Durgut used unidentified, unlicensed, and unqualified persons to render therapeutic exercises to B.M. and concealed the identity of the individual(s) that actually rendered and/or administered those services.

428. On October 27, 2017, B.M. was examined by a physician assistant purportedly under the supervision of Medical Doctor 3 ("Physician Assistant 1").

429. Physician Assistant 1 directed B.M. to continue physical therapy at ASR for an additional 2-3 times a week, for 4-6 weeks.

430. And despite B.M.'s reported improvement and reduction of pain, Physician Assistant 1 also wrote B.M. a prescription for the continued use of the Game Ready unit on another pre-printed prescription form supplied to Physician Assistant 1 by Midwest. Because Physician Assistant 1 sent the prescription directly to Midwest, Midwest was able to continue renting the unit at exorbitant rates.

431. The Defendants fraudulently billed B.M. for healthcare services that were not administered as represented, and in violation of Illinois law.

432. All of the fraudulent documentation for healthcare services that was allegedly dispensed to B.M. was sent through the U.S. Mail.

**Claimant: V.S.**
**DOL: March 2, 2021**
**Allstate Claim No.: 0617751839**

433. On March 2, 2021, V.S. was reportedly involved in a motor vehicle accident in Hillside, IL. As a result of the accident, V.S. reportedly sustained a concussion and soft-tissue injuries to her neck, and lower back.

434. On March 3, 2021, V.S. initially presented to the Emergency Department of Loyola Hospital, where CT scans of her head and x-rays of her lumbosacral and cervical spine were performed. There was no evidence of intracranial abnormality or acute fracture. She was diagnosed with a concussion and discharged.

435. Approximately one month after the accident, a physician affiliated with Medical Doctor 1 referred V.S. to ASR.

436. According to Dr. Vandenelzen, at this time, Medical Doctor 1 was also employed as the Medical Director of Metro, Dr. Vandenelzen's unlicensed surgery center.

437. On March 31, 2021, at the direction of an undisclosed physician affiliated with Medical Doctor 1, V.S. consulted with unnamed party, Doris Fregoso, D.C., at the Western Avenue location of ASR.

438. After a cursory examination, Dr. Fregoso instructed V.S. to begin ASR's pre-determined physical therapy protocol.

439.     Based upon the evidence gathered during Allstate's investigation, when V.S. purportedly performed therapeutic exercises at ASR, it was done under the direction of an unidentified, unlicensed, and unqualified employee(s).

440.     Dr. Fregoso and ASR, however, billed V.S. $130.00 per unit (each unit lasting 15 minutes) for therapeutic exercises pursuant to CPT code 97110. By billing for the therapeutic exercises under CPT code 97110, ASR misrepresented that a physician or other qualified health care professional rendered one-on-one assistance to the Allstate claimants who were performing therapeutic exercises.

441.     ASR ultimately submitted bills on behalf of V.S., supported by falsified records, that totaled $8,575.14.

442.     Pursuant to Midwest records, on April 12, 2021, Dr. Fregoso also wrote V.S. a prescription for a TENS unit on a pre-printed prescription form provided to her by Midwest that contained the fax number for Midwest/ASR. Significantly, neither Dr. Fregoso, nor anyone at ASR met with or treated V.S. on April 12, 2021.

443.     Dr. Fregoso purportedly delivered the TENS unit prescription directly to Midwest given that it is located at the same address as ASR (Western Avenue).

444.     Neither Dr. Fregoso nor anyone employed at Midwest disclosed to V.S. that the owner of ASR, Dr. Vandenelzen, also owned Midwest.

445.     No one informed V.S. that Midwest did not possess the requisite licensure to dispense DME.

446.    Midwest billed V.S. $600.00 pursuant to HCPCS E0730, representing that it provided V.S. with "[a] [t]ranscutaneous electrical nerve stimulation (TENS) device, four or more leads, for multiple nerve stimulation."

447.    Midwest did not identify the make or model of the TENS unit in its records or bills. However, based on information provided by other Allstate claimants, V.S. received a Health Herald 4-Mode Electric TENS, which may be purchased online for under $30.00.

448.    Pursuant to Midwest's records, it did not dispense the TENS unit to V.S. until May 18, 2021 – a full month after it was prescribed.  In light of the significant delay, the TENS unit was no longer medically necessary, if at all, particularly because V.S. continued to improve during this period without it.

449.    Midwest also billed V.S. $300.00 for "Tens supplies 2 leads" pursuant to HCPCS A4595.

450.    Based upon the evidence gathered during Allstate's investigation, the TENS unit came from the manufacturer with all necessary supplies for immediate use.  No additional lead wires were necessary or provided.

451.    The billing for HCPCS A4595 was false.

452.    Midwest also billed V.S. $100.00 pursuant to HCPCS A9901, representing that on May 18, 2021, over a month after it was prescribed, an employee of Midwest set-up and trained V.S. on how to operate the TENS unit.

453.    Midwest, however, did not identify the name or credentials of the person who reportedly set up the DME and trained V.S.

454.     Based on information provided by other Allstate claimants, no one from Midwest trained V.S. on the operation of the TENS unit.

455.     On April 12, 2021, V.S. consulted with Physician Assistant 2, who was purportedly under the supervision of Medical Doctor 1.

456.     After a cursory consultation, Physician Assistant 2 instructed V.S. to continue physical therapy, which was to be performed at ASR for 2-3 days a week, for 4-6 weeks.

457.     Physician Assistant 2 also prescribed V.S. the following medication:

- Diclofenac; and
- Lidocaine patches.

458.     As was part of the referral scheme, based upon the documentation submitted to Allstate by the Defendants, Physician Assistant 2 sent the medication prescriptions directly to Dr. Vandenelzen's pharmacy, Advanced Care.  However, neither Advanced Care, nor any other provider or pharmacy filled the prescription.  This suggests that the prescriptions were medically unnecessary.

459.     Despite the fact that the prescription was never filled, Physician Assistant 2 reported that she wrote new prescriptions for the medication on each subsequent visit. Again, these prescriptions that were purportedly sent directly to Advanced Care were never filled.

460.     On June 15, 2021, V.S. was in a second motor vehicle accident. Although her complaints of pain purportedly increased, she was discharged from physical therapy.

461.     V.S. did not seek any further treatment until October of 2021.  At that time, and according to V.S., Chiropractor, Dr. Fregoso, directed V.S. to Metro where she ultimately received injections in October and November of 2021.

462.    No documentation was submitted to Allstate by any healthcare professional regarding the necessity of the epidural injections. On information and belief, someone affiliated with ASR ordered the epidural injections.

463.    On October 1, 2021, V.S. was introduced to Medical Doctor 2 for the first time. That same day, and without providing the medical basis, Medical Doctor 2 injected V.S. with a Caudal Epidural Steroid Injection.

464.    Metro billed V.S. $11,750.00 for facility fees (despite being unlicensed).

465.    On November 5, 2021, V.S. returned to Metro, and underwent a Lumbar Transforaminal Epidural Steroid Injection, which was again purportedly performed by Medical Doctor 2 at Metro. Again, Medical Doctor 2 did not provide the medical basis for rendering this service.

466.    Metro billed V.S. an additional $9,750.00 for facility fees.

467.    Medical Doctor 2 did not charge V.S. for his professional services. Upon information and belief, he split the facility fee for administering the injections with Metro, an unlicensed surgery center, in violation of Illinois law.

468.    Medical Doctor 2 also arranged for V.S. to undergo monitored anesthesia services during the injection procedures.

469.    Based on documentation submitted to Allstate, Medical Doctor 2 did not inform V.S. that monitored anesthesia services with sedation was not required for the procedure to be performed.

470.    Presumably, monitored anesthesia services with sedation was only utilized to inflate the Metro bill.

471. Neither Medical Doctor 2, nor anyone employed at Metro told V.S. that Metro was an unlicensed surgery center.

472. Even though Metro is an unlicensed surgery center, Metro misrepresented that is was licensed to V.S.

473. A true and accurate copy of Metro's healthcare lien in connection with V.S. is depicted below:



474. Neither Medical Doctor 2 nor anyone employed at Metro told V.S. that Dr. Vandenelzen, the owner of ASR, also owned Metro.

475. Neither Medical Doctor 2, nor anyone employed at Metro told V.S. about Medical Doctor 2's referral arrangement with Dr. Vandenelzen.

476. The Defendants fraudulently billed V.S. for healthcare services that were not administered as represented, were not prescribed by a licensed medical doctor, nor medically necessary, and in violation of Illinois law.

477.   All of the fraudulent documentation for healthcare services that was allegedly provided to V.S. was sent through the U.S. Mail.

**Claimant: L.P.**
**DOL: October 10, 2021**
**Allstate Claim No.: 0644793838**

478.   On October 10, 2021, Allstate claimant, L.P. was reportedly involved in a motor vehicle accident in Chicago, IL.  As a result of the accident, L.P. apparently sustained soft-tissue injuries to his head, neck, left shoulder, right wrist, and bilateral knees.

479.   That same day, L.P. presented to the Emergency Department at Franciscan Health Hospital, where a CT scan was performed of L.P.'s cervical spine, which showed moderate degenerative changes, with no fracture or dislocation.  X-rays of L.P.'s lumbar spine and bilateral knees also showed no signs of fracture or dislocation.

480.   L.P. presented to ASR's Western Avenue location.

481.   According to L.P., an unidentified employee of ASR instructed him to first consult with Medical Doctor 2 before they would initiate therapy. ASR referred L.P. to Medical Doctor 2 without first having an ASR chiropractor examine L.P. to determine whether a referral was necessary.

482.   Based upon the evidence gathered during Allstate's investigation, L.P. was referred to Medical Doctor 2 because that happened to be the day that Medical Doctor 2 visited the ASR office.

483.   The actual reason ASR referred L.P. to Medical Doctor 2 was to provide Medical Doctor 2 with a patient to treat and bill, regardless of whether the consultation he purportedly performed was necessary.  In exchange, Medical Doctor 2 wrote prescriptions for physical therapy,

medication, DME, and a medical procedure, all of which were dispensed and/or performed at or through one of Dr. Vandenelzen's businesses.

484.    Neither Medical Doctor 2, nor anyone employed by ASR told L.P. about the Medical Doctor 2's relationship and agreement with Dr. Vandenelzen.

485.    A true and accurate copy of the patient status report created by Medical Doctor 2 for L.P. showing the source of the referral as ASR, and the location of the consultation as the Western Avenue location, is depicted below:



486.    During a cursory consultation, L.P. told Medical Doctor 2 that diagnostic testing was performed on him while he was at Franciscan Health. Medical Doctor 2, however, made no effort to order or analyze the diagnostic testing taken on the day of the accident. Instead, Medical Doctor 2 ordered additional and unnecessary diagnostic testing to try to legitimize his predetermined decision to treat L.P. with expensive and unnecessary medical procedures.

487.    Medical Doctor 2 scheduled L.P. for a follow-up appointment.

488.    Medical Doctor 2 billed L.P. $625.00, pursuant to CPT code 99245, representing that he consulted with L.P. at the request of another medical provider.  Because of the ASR referral to Medical Doctor 2, he ultimately billed L.P. $12,220.00 in services.

489.    Medical Doctor 2 also directed L.P. to begin physical therapy 2-3 times a week, for 4-6 weeks at ASR.

490.    Medical Doctor 2 also purportedly prescribed L.P. two different medications:

- Cyclobenzaprine (muscle relaxant); and
- Meloxicam (NSAID).

491.    Although the medication was billed by Advanced Care, no one informed L.P. about Medical Doctor 2's referral arrangement with Dr. Vandenelzen, and his businesses.

492.    Advanced Care billed L.P. $738.00 pursuant to CPT code 99070, representing that on October 13, 2021, a physician dispensed the medication.

493.    The Advanced Care records, however, report that a pharmacist, Sahawneh, PharmD, dispensed the medication directly to L.P. – in person – at the Western Avenue address of Advanced Care, which is located inside ASR's office.

494.    In fact, no one from Advanced Care interacted with L.P.

495.    According to L.P., it was Medical Doctor 2 that provided him with a limited amount of medication during the consultation.

496.    Despite this fact, Advanced Care falsely reported that a "Good Faith Effort" was made by Sahawneh, PharmD to obtain L.P.'s signature.

497. Based upon the evidence gathered during Allstate's investigation, Sahawneh, PharmD was not physically present at Advanced Care when Medical Doctor 2 dispensed the limited amount of medication to L.P., and L.P. never received the full dosage of medications.

498. Allstate is not required to pay Advanced Care for medication that was not dispensed as represented (or at all).

499. Medical Doctor 2 also wrote L.P. a prescription for a TENS unit and lumber back brace on a pre-printed form with Midwest/ASRs fax number.

500. A true and accurate pre-printed DME form submitted for L.P. is depicted below:

501.    Based upon the evidence gathered during Allstate's investigation, Medical Doctor 2 delivered the DME prescription directly to an employee of Midwest while at ASR's Western Avenue location.

502.    Neither Medical Doctor 2, nor anyone employed at Midwest informed L.P. about Medical Doctor 2's referral arrangement with Dr. Vandenelzen, and his businesses.

503.    Neither Medical Doctor 2, nor anyone employed at Midwest informed L.P that Midwest was not a licensed DME supplier in Illinois.

504.    Midwest billed L.P. $600.00 pursuant to HCPCS E0730, representing that it provided L.P. with a "[t]ranscutaneous electrical nerve stimulation (TENS) device, four or more leads, for multiple nerve stimulation."

505.    Midwest did not identify the make or model of the TENS unit in its records or bills. L.P., however, has confirmed that he received a Health Herald 4-Mode Electric TENS, which may be purchased online for less than $30.00.

506.    Midwest also billed L.P. $2,500.00 pursuant to HCPCS L0637, misrepresenting that a qualified "individual with expertise… trimmed, bent, molded, assembled, or otherwise customized" the lumbar-sacral orthosis (back brace) for L.P.

507.    The back brace supplied to L.P. was an Athena LSO back brace.

508.    Similar back braces can be purchased from retailers online for less than $150.00.

509.    Midwest also billed L.P. $100.00 pursuant to HCPCS A9901, representing that on October 15, 2021 an employee of Midwest set-up and trained L.P. on how to operate the TENS unit and back brace.

510.    Midwest, however, did not identify the name or credentials of the person who reportedly had the "expertise" to mold the back brace for L.P.

511.    According to L.P. an unidentified employee of ASR (not Midwest) taught him how to use the TENS unit and back brace.

512.    In addition to Midwest, ASR billed L.P. for teaching him how to use the TENS unit and back brace.

513.    By billing for the training that ASR performed, Midwest not only misrepresented how the DME was dispensed, but double billed for the service.

514.    Allstate is not required to pay Midwest for services that were not rendered as represented (or at all).

515.    On October 15, 2021, L.P. presented to the Western Avenue address, and this time he was examined by ASR chiropractor, Dr. Karban.

516.    After an examination, Dr. Karban instructed L.P. to begin ASR's pre-determined physical therapy protocol.

517.    Dr. Karban and/or the unlicensed employees directed multiple patients, including L.P., to perform therapeutic exercises in a group setting.

518.    ASR, however, billed L.P. $130.00 per unit (each unit lasting 15 minutes) for therapeutic exercises pursuant to CPT code 97110. By billing for the therapeutic exercises under CPT code 97110, ASR misrepresented that a physician or other qualified health care professional rendered one-on-one assistance to the Allstate claimants who were performing therapeutic exercises.

519.    Allstate is not required to pay ASR for treatment that was not rendered as represented.

520.    On October 27, 2021, L.P. had a follow-up appointment with Medical Doctor 2 at ASR's Western Avenue location.

521.    At that time, Medical Doctor 2 directed L.P. to continue physical therapy at ASR.

522.    And despite the fact that L.P reported improvement, he instructed L.P. to submit to a CT scan of his lumbar and cervical spine, and left shoulder. Medical Doctor 2 noted in his record that L.P. was claustrophobic to support his decision to deviate from his normal protocol of ordering MRI imaging for all his patients on the second or third visit.

523.    On November 10, 2021, L.P. had a third follow-up appointment with Medical Doctor 2 at ASR's Western Avenue location.

524.    Medical Doctor 2 purportedly reviewed L.P.'s CT scan imaging, which showed no acute abnormalities. In addition, L.P. reported continued improvement. Regardless, Medical Doctor 2 encouraged L.P. to undergo medically unnecessary facet joint injections for his neck and spine at Metro.

525.    Neither Medical Doctor 2, nor anyone employed at Metro informed L.P. about Medical Doctor 2's referral arrangement with Dr. Vandenelzen, and his businesses.

526.    Neither Medical Doctor 2, nor anyone employed at Metro informed L.P. that Metro was not a licensed ambulatory surgery center.

527.    On November 11, 2021, pursuant to records submitted by Advanced Care, Medical Doctor 2 purportedly wrote L.P. a medication prescription for a 30-day supply of Ondansetron on a pre-printed prescription form provided to him by Advanced Care.

528. A true and accurate copy of the Advanced Care prescription form for L.P. is depicted below:



529. Significantly, Medical Doctor 2 did not meet with or speak with L.P. on November 11, 2021.

530. Based upon the documentation submitted to Allstate by the Defendants, Medical Doctor 2 did not sign the prescription for Ondansetron.

531. As set out, Ondansetron is generally used to prevent nausea and vomiting caused by chemotherapy, radiation therapy, and surgery.

532.    Medical Doctor 2's records do not provide a medical basis for the prescription for Ondansetron.

533.    Advanced Care billed L.P. a total of $2,370.00 for the prescription medication pursuant to CPT code 99070, again representing that a physician dispensed the medication.

534.    The Advanced Care records, however, reflect that Sahawneh, PharmD dispensed the medication directly to L.P. at the Western Avenue location on November 11, 2021.

535.    Based upon the documentation submitted to Allstate by the Defendants, L.P. did not visit the Western Avenue location on November 11, 2021 and accordingly Sahawneh, PharmD did not dispense the Ondansetron to L.P.

536.    Advanced Care falsely billed for the Ondansetron under CPT code 99070.

537.    Advanced Care then misrepresented in its records that Sahawneh, PharmD was unable to secure L.P.'s signature when the Ondansetron was dispensed, but that a "Good Faith Effort" to obtain his signature was made.

538.    On November 12, 2021, L.P. presented to Metro for the procedures.

539.    Metro billed a total of $19,500.00 pursuant to CPT codes 64493 and 64494, with the Modifier – SG, misrepresenting that Metro is a surgical center, and representing that Medical Doctor 2 administered the facet joint injections at two levels.

540.    Metro did not provide a breakdown of the services it purportedly provided in any records submitted with its bills. Nor did it provide any records that demonstrates the origin of the medication purportedly injected into L.P.

541.    To further bill L.P., Medical Doctor 2 arranged for L.P. to undergo monitored anesthesia services during the procedures.

542.   Based on information provided by Allstate claimants, Medical Doctor 2 did not inform L.P. that monitored anesthesia services (with sedation) was not required for the procedures being performed.

543.   Based upon the evidence gathered during Allstate's investigation, in exchange for Medical Doctor 2's choice to perform the procedures at Metro, Metro hired an anesthesia company owned by Medical Doctor 2 to provide the monitored anesthesia services.

544.   Because Metro hired Medical Doctor 2's anesthesia company, Medical Doctor 2, through his anesthesia company, was able to bill L.P. an additional $2,061.00.

545.   No one informed L.P. that Medical Doctor 2 owned the anesthesia company.

546.   The Defendants fraudulently billed L.P. for healthcare services that were not administered as represented, were not medically necessary, and in violation of Illinois law.

547.   All of the fraudulent documentation for healthcare services that was allegedly dispensed to L.P. was sent through the U.S. Mail.

**Claimant: L.G.**
**DOL: December 18, 2021**
**Allstate Claim No.: 0652867946**

548.   On December 18, 2021, Allstate claimant, L.G. was reportedly involved in a motor vehicle accident in Chicago, IL. As a result of the accident, L.G. claimed to have sustained soft-tissue injuries to his neck, lower back, and left shoulder.

549.   That same day, L.G. presented to the Emergency Department at Ingalls Memorial Hospital where x-rays were performed of L.G.'s cervical spine, lumbar spine, and bilateral shoulders. There were no fractures or dislocations.

550.     Medical Doctor 2 acknowledged this fact in his records, but he made no effort to obtain or review the diagnostic tests from the Emergency Department at Ingalls Memorial Hospital. Instead, he would later ordered additional and unnecessary diagnostic testing to legitimize his pre-determined decision to treat L.G. with expensive and unnecessary medical procedures.

551.     On December 22, 2021, L.G. consulted with Alexander Karban, D.C. at ASR's Western Avenue location.

552.     After a cursory examination, Dr. Karban instructed L.G. to begin ASR's predetermined physical therapy protocol.

553.     Based upon the evidence gathered during Allstate's investigation, Dr. Karban delegated portions of L.G.'s physical therapy protocol to unlicensed employees of ASR. To obfuscate this fact, Dr. Karban did not identify the unlicensed employees on any of ASR's records and bills.

554.     Dr. Karban and/or the unlicensed employees directed multiple patients, including L.G., to perform therapeutic exercises in a group setting.

555.     ASR, however, billed L.G. $130.00 per unit (each unit lasting 15 minutes) for therapeutic exercises pursuant to CPT code 97110. By billing for the therapeutic exercises under CPT code 97110, ASR misrepresented that a physician or other qualified health care professional rendered one-on-one assistance to the Allstate claimants who were performing therapeutic exercises.

556.     Allstate is not required to pay ASR for treatment that was not rendered as represented.

557.     On December 29, 2021, at the direction of Dr. Karban, L.G. consulted Medical Doctor 2 at ASR's Western Avenue location.

558.     Medical Doctor 2 billed $625.00, pursuant to CPT code 99245, representing that he consulted with L.G. at the request of another medical provider. Because of the referral, Medical Doctor 2 was able to bill L.G. a total of $3,075.00.

559.     Medical Doctor 2 referred L.G. back to ASR to perform physical therapy 2-3 times a week, for 4-6 weeks at ASR.

560.     Medical Doctor 2 also wrote L.G. the following prescriptions:

- Cyclobenzaprine (muscle relaxant); and
- Meloxicam (NSAID).

561.     These prescriptions were delivered directly to Advanced Care given that Advanced Care is located in the same office as ASR (Western Avenue).

562.     Neither Medical Doctor 2 nor an employee or agent of Advanced Care informed L.G. about Medical Doctor 2's arrangement with Dr. Vandenelzen, and his businesses.

563.     L.G. did not have the opportunity to purchase the prescription medication from another pharmacy.

564.     Advanced Care billed a total of $976.80 for the two medication prescriptions pursuant to CPT code 99070, representing that pharmacist, Sahawneh, PharmD dispensed the medication—in person—to L.G. at the Western Avenue address on December 29, 2021.

565.     On information and belief, Medical Doctor 2 provided L.G. with some medication. Advanced Care falsely billed L.G. for the medication under CPT code 99070.

566.    Based upon the evidence gathered during Allstate's investigation, Advanced Care falsely reported that Sahawneh, PharmD made a "Good Faith Effort" attempt to obtain L.G.'s signature, in vain.

567.    Based upon the evidence gathered during Allstate's investigation, Sahawneh, PharmD did not dispense the medication to L.G.

568.    Allstate is not required to pay Advanced Care for medication that was not dispensed as represented (or at all).

569.    Medical Doctor 2 also purportedly wrote a prescription for a TENS unit on a pre-printed form bearing the fax number of ASR/Midwest.

570.    A true and accurate copy of a Midwest prescription form for L.G. is depicted below:



571.　No one informed L.P that Midwest was not a licensed DME supplier in Illinois.

572.　Midwest billed $600.00 pursuant to HCPCS E0730, representing that it supplied L.G. with a "[t]ranscutaneous electrical nerve stimulation (TENS) device, four or more leads, for multiple nerve stimulation."

573.　Midwest, however, did not identify the make or model of the TENS unit it supplied to L.G.

574. Based upon the documentation submitted to Allstate by the Defendants, Midwest dispensed a Health Herald Digital Therapy Machine to L.G., which can be purchased from an online retailer for under $30.00.

575. Midwest also billed $100.00 pursuant to HCPCS A9901, representing that an employee of Midwest set-up, delivered, and trained L.G. on how to use the TENS unit.

576. Based on information provided by Allstate claimants, no one employed at Midwest trained L.G. on how to use the TENS unit.

577. Based upon the evidence gathered during Allstate's investigation, Midwest shipped the TENS unit directly to L.G. in Illinois via Fed Ex from Dallas, Texas.

578. L.G. did not receive the TENS unit until January 24, 2022. Because of significant delay in dispensing the TENS unit, it was not medically necessary, especially since L.G. continued to improve from his injuries during the delay.

579. On January 26, 2022, L.G. presented for a second consultation with Medical Doctor 2 at the Western Avenue location of ASR.

580. During the second consultation, Medical Doctor 2 prescribed additional physical therapy to be performed at ASR.

581. And despite L.G.'s reported improvement at the time of the second consultation, and as part of Medical Doctor 2's predetermined practice to inflate costs, regardless of medical necessity, he instructed L.G. to submit for an MRI of the lumbar and cervical spine.

582. Medical Doctor 2 reported that he reviewed the MRI findings. However, he did not modify the predetermined treatment plan.

583. On February 9, 2022, L.G. presented for a third consultation with Medical Doctor 2 at the Western Avenue location of ASR. Despite L.G.'s continued improvement and reports of reduced pain, Medical Doctor 2 recommended that L.G. undergo bilateral facet joint injections and a corticosteroid injection to his left shoulder. L.G., however, declined the procedure, and opted to continue with conservative treatment.

584. Despite L.G.'s continued improvement, on February 16, 2022, Midwest purportedly provided L.G. with a back brace.

585. The prescription for the back brace was apparently written by Dr. Karban on a pre-printed form. The records, however, do not show when the prescription was written, or why the item was prescribed.

586. Based upon the documentation submitted to Allstate by the Defendants, the back brace purportedly supplied to L.G. was an Athena LSO back brace.

587. Similar back braces can be purchased from retailers online for less than $180.00.

588. Midwest billed $2,500.00 pursuant to HCPCS L0637, representing that a qualified "individual with expertise… trimmed, bent, molded, assembled, or otherwise customized" the lumbar-sacral orthosis (back brace) for L.G.

589. Midwest also billed $100.00 pursuant to HCPCS A9901, representing that an employee of Midwest set-up, delivered, and trained L.G. on how to use the back brace.

590. Midwest did not identify the person who reportedly had the "expertise" to mold the back brace for L.P.

591. Based on information provided by Allstate claimants, no one trained L.G. on how to use the back brace.

592. On March 2, 2022, L.G. presented for a fourth consultation with Medical Doctor 2 at the Western Avenue location of ASR. Despite L.G.'s further improvement and continued reports of reduced pain, Medical Doctor 2, again, pressured L.G. to undergo bilateral facet joint injections.

593. L.G. again declined, but opted to undergo a corticosteroid injection procedure in his left shoulder.

594. Neither Medical Doctor 2, nor anyone employed at Metro informed L.G that Metro was not a licensed ambulatory surgery center.

595. On March 10, 2022, pursuant to records submitted by Advanced Care, Medical Doctor 2 purportedly wrote L.G. a medication prescription for a 30-day supply of Ondansetron on a pre-printed prescription form provided to him by Advanced Care.

596. A true and accurate copy of the Advanced Care pre-printed prescription form for L.G. is depicted below:



597.    Medical Doctor 2 did not meet with or speak with L.G. on March 10, 2021.

598.    Medical Doctor 2's records do not support the prescription for Ondansetron.

599.    Because Medical Doctor 2 purportedly sent the prescription for Ondansetron directly to Advanced Care, Advanced Care was able to bill L.G. a total of $2,370.00 for the prescription medication pursuant to CPT code 99070, again representing that Sahawneh, PharmD dispensed the medication directly to L.G. at the Western Avenue location on March 10, 2021.

600.    Again, Advanced Care falsely billed for CPT code 99070.

601.    Based upon the evidence gathered during Allstate's investigation, L.G. did not visit the Western Avenue location on March 10, 2021.

602.    Based upon the evidence gathered during Allstate's investigation, Sahawneh, PharmD did not dispense the Ondansetron to L.G.

603.    In the event the Ondansetron was dispensed, neither Medical Doctor 2, nor an employee or agent of Advanced Care provided L.G. with the price of the prescription medication before dispensing it to him. Nor did they give him the opportunity to purchase the prescription medication from another pharmacy. This was done to guarantee that Advanced Care would profit, and to obfuscate the inflated amount Advanced Care was going to charge for the Ondansetron.

604.    In the event the Ondansetron dosage was purportedly dispensed to L.G., based on information provided by Allstate claimants, the medication L.G. received was far less than the dosage Advanced Care claimed to have dispensed.

605.    On March 11, 2022, L.G. presented at Metro for a corticosteroid injection procedure.

606.    Because Medical Doctor 2 referred L.G. to Metro for the procedure, Metro was able to bill L.G. $1,000.00 pursuant to CPT code 20610, with the Modifier – SG, first misrepresenting that Metro is a surgical center, and misrepresenting that Metro administered an "injection into, a major joint (defined as a shoulder, hip, knee, or subacromial bursa), or both aspiration and injection of the same joint."

607.    Metro did not provide an itemized breakdown of the services it purportedly provided to L.G. in any records or bills.

608.     Metro did not provide any records that demonstrates the origin of the medication purportedly injected into L.G.

609.     The Defendants fraudulently billed L.G. for healthcare services that were not administered as represented, were not medically necessary, and in violation of Illinois law.

610.     All of the fraudulent documentation for healthcare services that was allegedly dispensed to L.G. was sent through the U.S. Mail.

**Claimant: K.K.**
**DOL:  4/4/2022**
**Allstate Claim No.: 0664686946**

611.     On April 4, 2022, Allstate claimant, K.K., was reportedly involved in a motor vehicle accident in Chicago, IL.  As a result of the accident, K.K. reportedly sustained soft-tissue injuries to his lower back, and neck.

612.     On the same day, K.K. presented to the Little Company of Mary Medical Center where x-rays were taken of his chest and lower back. There were no fractures or dislocations identified.

613.     On April 6, 2022, K.K. presented to the Western Avenue location of ASR.

614.     ASR referred K.K. to Medical Doctor 2 without first having an ASR chiropractor examine K.K. to determine whether a referral was medically necessary.

615.     A true and accurate copy of the "Referred By" section of Medical Doctor 2's Patient Status Report of K.K. is depicted below:



616.    K.K. was referred to Medical Doctor 2 so he could generate referrals for physical therapy, medication, DME, and medical procedure(s), all of which would be dispensed and/or performed at or through one of Dr. Vandenelzen's businesses.

617.    Neither Medical Doctor 2, nor anyone employed by ASR told K.K. about Medical Doctor 2's relationship and agreement with Dr. Vandenelzen.

618.    On April 6, 2022, K.K. presented to Medical Doctor 2, who was seeing patients at ASR's Western Avenue location.

619.    K.K. informed Medical Doctor 2 that he had undergone diagnostic testing while at Little Company of Mary. Medical Doctor 2 acknowledged this fact in his records, but he made no effort to obtain or review the diagnostic tests from Little Company of Mary. Instead, he later ordered additional and unnecessary diagnostic testing to legitimize his pre-determined decision to treat K.K. with expensive and unnecessary medical procedures.

620.    Medical Doctor 2 billed K.K. $625.00 for the consultation pursuant to CPT code 99245, representing that he consulted with K.K. at the request of someone affiliated with ASR. Because of the referral, Medical Doctor 2 ultimately billed K.K. $19,500.00 for purported services.

621.    Medical Doctor 2 instructed K.K. to undergo physical therapy 2-3 times a week, for 4-6 weeks at ASR.

622.    Medical Doctor 2 also purportedly wrote a prescription for a TENS unit on a pre-printed Midwest form. The pre-printed form had ASR/Midwest's fax number in the header.

623.    A true and accurate copy of K.K.'s prescription is depicted below:



624.    Neither Medical Doctor 2, nor an employee of Midwest informed K.K. that Midwest was not a licensed DME supplier.

625.    Neither Medical Doctor 2, nor an employee of Midwest informed K.K. that Dr. Vandenelzen, the owner of ASR was also the owner of Midwest.

626.    Midwest billed K.K. $600.00 pursuant to HCPCS E0730, representing that it supplied K.K. with a "[t]ranscutaneous electrical nerve stimulation (TENS) device, four or more leads, for multiple nerve stimulation."

627.    Midwest, however, did not identify the make or model of the TENS unit it purportedly supplied to K.K.

628.    Based on information provided by Allstate claimants, Midwest dispensed a Health Herald Digital Therapy Machine to K.K., which can be purchased from an online retailer for under $30.00.

629.    Midwest also billed K.K. $100.00 pursuant to HCPCS A9901, representing that an employee of Midwest set-up, delivered, and trained K.K. on how to use the TENS unit.

630.    Based on information provided by Allstate claimants, no one trained K.K. on how to use the TENS unit.

631.    Instead, based on information provided by Allstate claimants, an employee of ASR handed the TENS unit to K.K. on April 6, 2022. If any training occurred, it was performed by ASR staff, and ASR separately billed for that service. Thus, Midwest billed K.K. for training that it never provided.

632.    In regard to medication, Medical Doctor 2 did not personally prescribe any medication to K.K. following the first consultation. However, he notes that K.K. *could* continue to use Lidocaine patches for pain, which suggests that the Lidocaine patches were dispensed to K.K. by Advanced Care without a prescription.

633.    Significantly, Physician Assistant 3, who was purportedly under the supervision of Medical Doctor 2, separately wrote K.K. a prescription for Lidocaine patches and Meloxicam on the same day Medical Doctor 2 first consulted with K.K. (April 6, 2022). Pursuant to Medical Doctor 2's records and bills, Physician Assistant 3 never examined K.K. Moreover, Neither Medical Doctor 2, nor Physician Assistant 3 provided the medical basis for prescribing the medication.

634.    Physician Assistant 3 or an employee of ASR submitted the two medication prescriptions directly to Advanced Care, given that Advanced Care is located in the same office as ASR (Western Avenue).

635.    Neither Medical Doctor 3, nor an employee of ASR informed K.K. that Dr. Vandenelzen, the owner of ASR, was also the owner of Advanced Care.

636.    Advanced Care billed K.K. $961.50 for the two medication prescriptions pursuant to CPT code 99070, misrepresenting that on April 6, 2022, an unidentified physician dispensed the medication.

637.    Pursuant to Advanced Care's records, Sahawneh, PharmD dispensed the medication to K.K. – in person at the Western Avenue location.

638.    Advanced Care, however, falsely reported that Sahawneh, PharmD made a "Good Faith Effort" attempt to obtain K.K.'s signature.

639.    Based upon the evidence gathered during Allstate's investigation, Sahawneh, PharmD did not dispense the medication to K.K.

640.     In the event the medication was dispensed, based upon the evidence gathered during Allstate's investigation, it was dispensed by an employee of ASR who was unlicensed to dispense medication.

641.     Allstate is not required to pay Advanced Care for medication that was not dispensed as represented (or at all).

642.     On April 8, 2022, K.K. consulted with chiropractor, Dr. Karban at ASR's Western Avenue location.

643.     Because of Medical Doctor 2's reciprocal referral back to ASR, ASR billed K.K. a total of $6.397.02.

644.     Based upon the evidence gathered during Allstate's investigation, Dr. Karban delegated portions of K.K.'s physical therapy protocol to unlicensed employees of ASR. To obfuscate this fact, Dr. Karban did not identify the unlicensed employees on any of ASR's records and bills.

645.     Dr. Karban and/or the unlicensed employees directed multiple patients, including K.K., to perform therapeutic exercises in a group setting.

646.     ASR, however, billed K.K. $130.00 per unit (each unit lasting 15 minutes) for therapeutic exercises pursuant to CPT code 97110. By billing for the therapeutic exercises under CPT code 97110, ASR misrepresented that a physician or other qualified health care professional rendered one-on-one assistance to the Allstate claimants who were performing therapeutic exercises.

647.     Allstate is not required to pay ASR for treatment that was not rendered as represented.

648.    Pursuant to the records submitted by Medical Doctor 2, on April 20, 2022, K.K. purportedly returned for a second consultation at ASR.

649.    Medical Doctor 2 instructed K.K. to continue physical therapy at ASR.

650.    And despite K.K.'s report of improvement and reduced pain, Medical Doctor 2 prescribed the following medications:

- Cyclobenzaprine (muscle relaxant); and
- A refill of Meloxicam (NSAID).

651.    Medical Doctor 2 or an employee of ASR sent the medication prescriptions directly to Advanced Care.

652.    Advanced Care billed K.K. a total of $1,117.80 for the medication prescriptions pursuant to CPT code 99070, misrepresenting that on April 20, 2022, a physician dispensed the medication.

653.    Pursuant to Advanced Care's records, Raei, PharmD, dispensed the medication to K.K. – in person, at the Western Avenue location.

654.    Advanced Care falsely reported that Raei, PharmD made a "Good Faith Effort," in vain, to obtain K.K.'s signature.

655.    Based upon the evidence gathered during Allstate's investigation, no one from Advanced Care offered to counsel K.K. when the new medication was purportedly dispensed.

656.    Based upon the evidence gathered during Allstate's investigation, Neither Raei nor Sahawneh, PharmD dispensed the medication to K.K.

657.    Allstate is not required to pay Advanced Care for medication that was not dispensed as represented (or at all).

658. On May 4, 2022, K.K. purportedly returned for a third consultation at ASR's Western Avenue location with Medical Doctor 2.

659. And despite K.K.'s report of continued pain reduction and overall improvement, Medical Doctor 2 instructed K.K. to continue physical therapy at ASR and purportedly wrote prescription refills for Meloxicam and Cyclobenzaprine.

660. Advanced Care billed K.K. an additional $390.00 for the medication pursuant to CPT code 99070, misrepresenting that on May 4, 2022, an unidentified physician dispensed the medication.

661. Pursuant to Advanced Care's records, Raei, PharmD, dispensed the medication to K.K. – in person, at the Western Avenue location.

662. Again, no one from Advanced Care obtained K.K.'s signature before purportedly dispensing the prescribed medications.

663. Again, based upon the evidence gathered during Allstate's investigation, no one from Advanced Care offered to counsel K.K. when the new medication was purportedly dispensed.

664. Based upon the evidence gathered during Allstate's investigation, neither Raei, nor Sahawneh, PharmD refilled and dispensed the medication to K.K.

665. Allstate is not required to pay Advanced Care for medication that was not dispensed as represented (or at all).

666. On May 25, 2022, K.K. returned for a fourth consultation with Medical Doctor 2 at ASR, wherein he instructed K.K. to continue physical therapy at ASR.

667.     And despite K.K.'s continued improvement and reports of reduced pain, Medical Doctor 2 directed K.K. to undergo a series of bilateral facet joint injections in the lumbar and cervical spine over two days at Metro.

668.     Neither Medical Doctor 2, nor an employee of Metro informed K.K. that Dr. Vandenelzen, the owner of ASR, Advanced Care, and Midwest, was also the owner of Metro.

669.     No one affiliated or employed by ASR, Metro, and/or Medical Doctor 2 informed K.K. that Metro is not a licensed Ambulatory Surgery Center.

670.     On May 27, 2022, and June 3, 2022. K.K. presented at Metro for facet joint injections in his lumbar and cervical spine, respectively.

671.     And while Medical Doctor 2 noted in his May 27, 2022 record concerning the first round of injections that Ondansetron was prescribed, the prescription was never generated or filled. This suggests that the prescription was not medically necessary, and is routinely prescribed as part of the predetermined treatment protocol to inflate costs.

672.     Metro billed K.K. a total of $19,500 pursuant to CPT code 64493 and CPT 64494, with the Modifier – SG, misrepresenting that Metro is a surgical center, and representing that Medical Doctor 2 administered the facet joint injections at two levels of K.K.'s lumbar and cervical spine.

673.     Metro did not provide an itemized breakdown of the services it purportedly provided to K.K. in any records or bills.

674.     Metro did not provide any records that reveal the origin of the medication purportedly injected into K.K.

675.  To further bill K.K., Medical Doctor 2 also arranged for K.K. to undergo monitored anesthesia services during the procedures.

676.  Based upon the evidence gathered during Allstate's investigation, Medical Doctor 2 did not inform K.K. that monitored anesthesia services (with sedation) was not required for the procedures to be performed.

677.  Metro hired Medical Doctor 2's own anesthesia company to provide the monitored anesthesia services.

678.  This allowed Medical Doctor 2's anesthesia business to bill K.K. an additional $4,116.00 for unnecessary anesthesia services.

679.  Neither Medical Doctor 2 nor anyone employed at Metro informed K.K. that Medical Doctor 2 owned the anesthesia company.

680.  Medical Doctor 2 billed K.K. $10,170.00 pursuant to CPT codes 64493 and 64494, representing that he administered bilateral facet joint injections in his lumbar spine, with anesthesia to K.K.

681.  Metro billed $19,500.00 for these exact same services pursuant to CPT codes 64493 and 64494, with the Modifier – SG, misrepresenting that Metro is a surgical center, when it is unlicensed.

682.  The Defendants fraudulently billed K.K. for healthcare services that were not administered as represented, were not medically necessary, and in violation of Illinois law.

683.  All of the fraudulent documentation for healthcare services that was allegedly dispensed to K.K. was sent through the U.S. Mail.

**Claimant: B.M.**
**DOL: 5/13/2022**
**Allstate Claim No.: 0669644121**

684.    On May 13, 2022, Allstate claimant, B.M., was reportedly involved in a motor vehicle accident in Chicago, IL.  As a result of the accident, B.M. reportedly sustained soft-tissue injuries to his lower back, neck, and right shoulder.

685.    Shortly thereafter, B.M. presented to an emergency room where diagnostic tests were performed.

686.    On May 17, 2022, B.M. consulted with Dr. Karban at the Western Avenue branch of ASR.

687.    After a cursory examination, Dr. Karban instructed B.M. to begin ASR's predetermined physical therapy protocol.

688.    Dr. Karban delegated portions of B.M.'s physical therapy treatment protocol to unlicensed employees of ASR. To obfuscate this fact, Dr. Karban did not identify the unlicensed employees by name on any of ASR's records and bills.

689.    Based upon the evidence gathered during Allstate's investigation, Dr. Karban and/or the unlicensed assistants directed multiple patients to perform therapeutic exercises in a group setting.

690.    By billing for the therapeutic exercises under CPT code 97110, ASR misrepresented that a physician or other qualified health care professional rendered one-on-one assistance to the Allstate claimants who were performing therapeutic exercises.

691.    To further facilitate the Defendants' scheme, Dr. Karban next referred B.M. to Medical Doctor 2.

692.    Neither Dr. Karban, nor anyone employed by ASR told B.M. about Dr. Vandenelzen's agreement with Medical Doctor 2.

693.    To obfuscate the Defendants' relationship and agreement from B.M. and Allstate, Dr. Karban represented in his records that he instructed B.M. to meet with Medical Doctor 2 so the doctor could prescribe him medication because the over-the-counter medication he was taking was not alleviating his pain.

694.    Medical Doctor 2 billed $625.00 pursuant to CPT code 99245, representing that he consulted with B.M. at the request of someone affiliated with ASR.  Because of the referral, Medical Doctor 2 ultimately billed B.M. a total of $20,205.00 in connection with B.M.

695.    On May 18, 2022, B.M. presented to Physician Assistant 3, who was meeting with patients at ASR's Western Avenue location, and purportedly under the supervision of Medical Doctor 2.

696.    B.M. informed Physician Assistant 3 that diagnostic testing was performed on him at the emergency room.  Physician Assistant 3 made no effort to obtain or review the diagnostic testing.  Instead, she would later order additional and unnecessary diagnostic testing to legitimize Medical Doctor 2's predetermined decision to treat B.M. with expensive and unnecessary medical procedures.

697.    After a cursory consultation, Physician Assistant 3 referred B.M. back to ASR for continued physical therapy services.

698.    As a result of Physician Assistant 3 reciprocal referral back to ASR, ASR billed a total of $15,029.59 in connection with B.M.

699.    Physician Assistant 3 also prescribed B.M. the following medication:

- Meloxicam;
- Cyclobenzaprine;
- Lidocaine patches; and
- Diclofenac cream.

700.    Physician Assistant 3 or an employee of ASR sent the medication prescriptions directly to Advanced Care.

701.    Neither Physician Assistant 3 nor Dr. Karban informed B.M. that Dr. Vandenelzen, the owner of ASR was also the owner of Advanced Care.

702.    Advanced Care billed a total of $3,917.00 pursuant to CPT code 99070, representing that on May 18, 2022, Raei, PharmD dispensed the medication to B.M.—in person— at Advanced Care's Western Avenue location.

703.    Advanced Care falsely reported that a "Good Faith Effort" was made by Raei, PharmD to obtain B.M.'s signature.

704.    Advanced Care falsely billed B.M. for the medication for CPT code 99070.

705.    Based upon the evidence gathered during Allstate's investigation, no one from Advanced Care attempted to get B.M.'s signature before dispensing the prescribed medication.

706.    Based upon the evidence gathered during Allstate's investigation, Raei, PharmD did not dispense the medication to B.M.

707.    Based upon the evidence gathered during Allstate's investigation, if any medication was dispensed, what B.M. received was far less than the dosage Advanced Care claimed to have dispensed.

708.    Physician Assistant 3 also purportedly wrote B.M. a prescription for a TENS unit on a preprinted form.

-104-

709.     A true and accurate copy of B.M.'s prescription for a TENS unit is depicted below:



710.     Neither Physician Assistant 3, nor anyone employed by ASR or Midwest informed B.M. that Midwest was not a licensed DME supplier.

711.     Neither Physician Assistant 3, nor anyone employed by ASR or Midwest informed B.M. that Dr. Vandenelzen, the owner of ASR and Advanced Care was also the owner of Midwest.

712.     Midwest billed $600.00 pursuant to HCPCS E0730, representing that it supplied B.M. with a "[t]ranscutaneous electrical nerve stimulation (TENS) device, four or more leads, for multiple nerve stimulation."

713.     Midwest did not identify the make or model of the TENS unit in its records or bills.

714.    Based on information provided by Allstate claimants, B.M. was provided with a Health Herald 4-Mode Electric TENS, which may be purchased online for less than $30.00.

715.    Midwest also billed an additional $100.00 pursuant to HCPCS A9901, representing that an employee of Midwest set-up, delivered, and trained B.M. on how to use the TENS unit.

716.    Based on information provided by Allstate claimants, no one employed at Midwest trained B.M. on how to use the TENS unit.

717.    If any training occurred, it was performed by ASR staff, and ASR separately billed for that service. Thus, Midwest billed B.M. for training that it never rendered.

718.    On July 1, 2022, B.M. purportedly returned for a second consultation via telemedicine, which was purportedly conducted by Physician Assistant 3.

719.    In her records, Physician Assistant 3 noted that Dr. Karban had ordered an MRI scan of B.M.'s lumbar and cervical spine, and that she reviewed the MRI scan findings. Notably, Physician Assistant 3 did not relate any medical issue depicted therein to the May 13, 2022 motor vehicle accident.

720.    Physician Assistant 3 instructed B.M. to continue physical therapy at ASR.

721.    Rather than waiting to see whether the continued physical therapy she prescribed would reduce B.M.'s reported pain, Physician Assistant 3 instructed B.M. to undergo a series of bilateral facet joint injections in the lumbar and cervical spine over two days at Metro.

722.    Physician Assistant 3 did not inform B.M. that Dr. Vandenelzen, the owner of ASR, Advanced Care, and Midwest, was also the owner of Metro.

723.    No one affiliated or employed by Medical Doctor 2, ASR, and/or Metro informed B.M. that Metro was not a licensed Ambulatory Surgery Center.

724. On July 22, 2022, and October 21, 2022, B.M. presented at Metro where Medical Doctor 2 allegedly administered the facet joint injections into the right and left side of B.M.'s lumbar facet joint and cervical facet joint, respectively, using Monitored Anesthesia Care.

725. Medical Doctor 2 billed B.M. $17,870.00 pursuant to CPT codes 64493 and 64494, representing that he administered bilateral facet joint injections in his lumbar spine, and cervical spine.

726. Metro billed $19,500.00 for these exact same services pursuant to CPT codes 64493 and 64494, with the Modifier – SG, misrepresenting that Metro is a surgical center, when it is unlicensed.

727. Metro did not provide an itemized breakdown of the services it purportedly provided to B.M. in any records or bills.

728. Metro did not provide any records that reveal the origin of the medication purportedly injected into B.M.

729. To further bill B.M., Medical Doctor 2 also arranged for B.M. to undergo monitored anesthesia services during the procedures.

730. Based on information provided by Allstate claimants, Medical Doctor 2 did not inform B.M. that monitored anesthesia services (with sedation) was not required for the procedures to be performed.

731. Based upon the evidence gathered during Allstate's investigation, in exchange for Medical Doctor 2's choice to perform the procedures at Metro, Metro hired Medical Doctor 2's anesthesia company to provide the monitored anesthesia services.

732. Because Metro hired Medical Doctor 2's anesthesia company, was able to bill B.M. an additional $3,959.00 for monitored anesthesia services.

733. Neither Medical Doctor 2 nor anyone employed at his anesthesia company informed B.M. that Medical Doctor 2 owned it.

734. The Defendants fraudulently billed B.M. for healthcare services that were not administered as represented, were not medically necessary, and in violation of Illinois law.

735. All of the fraudulent documentation for healthcare services that was allegedly dispensed to B.M. was sent through the U.S. Mail.

**Claimant: T.T.**
**DOL: September 18, 2023**
**Allstate Claim No.: 0729483594**

736. On September 18, 2023, Allstate claimant, T.T., was reportedly involved in a motor vehicle accident in Chicago, IL. As a result of the accident, T.T. reportedly sustained injuries to her lower back, midback, and left shoulder.

737. On September 19, 2023, T.T. presented to West Suburban Hospital where she underwent a CT scan of the cervical spine. While degenerative spondylosis was noted, there were no fractures or an acute spine abnormality found.

738. On September 21, 2023, T.T. consulted with unnamed chiropractor, Fayaz Ather, D.C. ("Dr. Ather"), at ASR's Laramie Avenue location.

739. After purportedly examining T.T., Dr. Ather instructed her to begin ASR's predetermined physical therapy protocol.

740. Dr. Ather delegated portions of T.T.'s physical therapy protocol to unlicensed employees of ASR. To obfuscate this fact, Dr. Ather did not identify the unlicensed employees on any of ASR's records and bills.

741. Dr. Ather and/or the unlicensed employees directed multiple patients, including T.T., to perform therapeutic exercises in a group setting.

742. ASR, however, billed T.T. $130.00 per unit (each unit lasting 15 minutes) for therapeutic exercises pursuant to CPT code 97110. By billing for the therapeutic exercises under CPT code 97110, ASR misrepresented that a physician or other qualified health care professional rendered one-on-one assistance to the Allstate claimants who were performing therapeutic exercises.

743. Allstate is not required to pay ASR for treatment that was not rendered as represented.

744. To further facilitate the Defendants' scheme, Dr. Ather referred T.T. to Medical Doctor 2.

745. A true and accurate copy of T.T.'s patient status report is depicted below:

746. Neither Dr. Ather, nor anyone employed by ASR told T.T. about Medical Doctor 2's referral arrangement with Dr. Vandenelzen, and his businesses.

747. To obfuscate the Defendants' relationship and agreement from T.T. and Allstate, Dr. Ather represented in his records that he instructed T.T. to meet with a physician so he could prescribe her medication because the over-the-counter medication she was taking was not alleviating her pain.

748. The actual reason Dr. Ather referred T.T. to Medical Doctor 2 was to Medical Doctor 2 with a patient to treat and bill, regardless of whether the treatment was necessary. In exchange, Medical Doctor would write prescriptions for physical therapy, medication, DME, and medical procedures, all of which would be filled or rendered to T.T. at one of Dr. Vandenelzen's businesses.

749. On September 26, 2023, T.T. purportedly consulted with Medical Doctor 2. During a cursory consultation, T.T. told Medical Doctor 2 that diagnostic testing was performed on him while he was at West Suburban Hospital. Medical Doctor 2, however, made no effort to order or analyze the diagnostic testing taken on the day of the accident. Instead, Medical Doctor 2 would later order additional and unnecessary diagnostic testing to try to legitimize his predetermined decision to treat T.T. with expensive and unnecessary medical procedures.

750. As a result of Dr. Ather's referral, Medical Doctor 2 was able to bill T.T. $625.00 pursuant to CPT code 99245, representing that he consulted with T.T. at the request of Dr. Ather for the purpose of recommending certain care. Because of the ASR referral to Medical Doctor 2, he ultimately billed T.T. $1,395.00.

751. After a cursory consultation, Medical Doctor 2 instructed T.T. to continue physical therapy 2-3 times a week, for 4-6 weeks at ASR.

752. Medical Doctor 2 also wrote T.T. the following medication prescriptions:

- Cyclobenzaprine (muscle relaxant); and
- Meloxicam (NSAID).

753. Based upon the documentation submitted to Allstate by the Defendants, Medical Doctor 2 sent the medication prescriptions directly to Advanced Care.

754. Medical Doctor 2 did not inform T.T. that Dr. Vandenelzen, the owner of ASR was also the owner of Advanced Care.

755. Neither Medical Doctor 2 nor anyone employed at Advanced Care informed T.T. about Medical Doctor 2's referral arrangement with Dr. Vandenelzen, and his businesses.

756.     Advanced Care billed T.T. a total of $498.30 pursuant to CPT code 99070, representing that on September 27, 2023, an unidentified physician dispensed the medication.

757.     Pursuant to Advanced Care's records, Hindi Hussein, PharmD ("Mr. Hussein") dispensed the medication to T.T. – in person, despite the fact T.T, never visited Advanced Care, which is located inside ASR's Western Avenue location.

758.     The Advanced Care records further purport that T.T. refused counseling.

759.     Based upon the evidence gathered during Allstate's investigation, no one from Advanced Care offered to counsel T.T. when the medication was dispensed.

760.     Based on information provided by Allstate claimants, if the medication was actually dispensed, T.T. did not receive the full dosage of medications that Medical Doctor 2 purportedly prescribed, and Advanced Care allegedly dispensed.

761.     Based upon the evidence gathered during Allstate's investigation, no one from Advanced Care attempted to get T.T.'s signature before dispensing the prescribed medication.

762.     Based on information provided by Allstate claimants, someone other than Mr. Hussein dispensed the medication to T.T.

763.     Medical Doctor 2 also wrote T.T. a prescription for a TENS unit on a pre-printed form provided by Dr. Vandenelzen with Midwest/ASR's fax number set out at the top.

764.     A true and accurate copy of T.T.'s TENS prescription is depicted below:

765.    Neither Medical Doctor 2, nor anyone employed at Midwest informed T.T. that Dr. Vandenelzen, the owner of ASR and Advanced Care was also the owner of Midwest.

766.    Based upon the documentation submitted to Allstate by the Defendants, Medical Doctor 2 sent the DME prescription directly to Midwest.

767.    Neither Medical Doctor 2, nor anyone employed at Midwest informed T.T. about Medical Doctor 2's referral arrangement with Dr. Vandenelzen, and his businesses.

768.    Neither Medical Doctor 2, nor anyone employed at Midwest informed T.T. that Midwest was not a licensed DME supplier in Illinois.

769.     Midwest billed $600.00 pursuant to HCPCS E0730, representing that it supplied T.T. with a "[t]ranscutaneous electrical nerve stimulation (TENS) device, four or more leads, for multiple nerve stimulation."

770.     Midwest did not identify the make or model of the TENS unit in its records or bills. Based on information provided by Allstate claimants, T.T received a Health Herald 4-Mode Electric TENS, which may be purchased online for less than $30.00.

771.     Midwest also billed $100.00 pursuant to HCPCS A9901, representing that an employee of Midwest set-up, delivered, and trained T.T. on how to use the TENS unit.

772.     Based upon the evidence gathered during Allstate's investigation, no one from Midwest trained T.T. on how to use the TENS unit. Instead, according the documentation submitted to Allstate by the Defendants, an employee of ASR handed the TENS unit to T.T. when she presented for physical therapy. If any training occurred, ASR would have billed for that service.

773.     By billing for the training that ASR performed, Midwest not only misrepresented how the DME was dispensed, but double billed for the service.

774.     On October 17, 2023, T.T. returned for a second consultation with Medical Doctor 2 wherein he instructed T.T. to continue physical therapy at ASR.

775.     And despite T.T.'s reported improvement at the time of the second consultation, he instructed T.T. to submit for an MRI of the lumbar and cervical spine. In this case, however, T.T. purportedly informed Medical Doctor 2 that she was claustrophobic. As such, Medical Doctor 2 instructed T.T. to undergo a CT scan of those regions instead. Although readily available, Medical

Doctor 2 did not order or review the CT scans already taken at West Suburban Hospital on September 19, 2023.

776.     Although Medical Doctor 2 reported that he reviewed the new CT scan findings, he does not relate any issue depicted therein to the September 18, 2023 motor vehicle accident.

777.     On October 31, 2023, T.T. returned for a third consultation with Medical Doctor 2 wherein he instructed T.T. to continue physical therapy at ASR.

778.     Medical Doctor 2 then wrote T.T. another prescription to refill her Cyclobenzaprine and Meloxicam medication.

779.     Medical Doctor 2, again, did not inform T.T. that Dr. Vandenelzen, the owner of ASR, Advanced Care, and Midwest was also the owner of Promedix.

780.     Neither Medical Doctor 2 nor anyone employed at Promedix informed T.T. about Medical Doctor 2's referral arrangement with Dr. Vandenelzen, and his businesses.

781.     Promedix billed T.T. a total of $498.30 for the refills pursuant to CPT code 99070, representing that on November 1, 2023, an unidentified physician dispensed the medication.

782.     Pursuant to Promedix's, Hussein, PharmD dispensed the medication to T.T. – in person, despite the fact T.T. never visited Promedix, which is also situated at the Western Avenue location.

783.     Based upon the evidence gathered during Allstate's investigation, no one from Promedix offered to counsel T.T. if and when the medication was dispensed.

784.     The Promedix records further purport that T.T. refused counseling.

785. If the medication was actually dispensed, T.T. did not receive the full dosage of medications that Medical Doctor 2 purportedly prescribed, and Advanced Care and Promedix allegedly dispensed.

786. Based upon the evidence gathered during Allstate's investigation, no one from Advanced Care and Promedix attempted to get T.T.'s signature before dispensing the prescribed medication.

787. Based on information provided by Allstate claimants, someone other than Mr. Hussein dispensed the medication to T.T.

788. Despite T.T.'s continued improvement and reports of reduced pain at the time of the third consultation, Medical Doctor 2 instructed T.T. to undergo bilateral facet joint injections in the cervical and lumbar spine. T.T. declined the procedure, and opted to stay with conservative treatment.

789. On November 9, 2023, perhaps realizing that T.T. was not going to participate in the predetermined treatment protocol, Medical Doctor 2 discharged T.T. by way of telehealth.

790. The Defendants fraudulently billed T.T. for healthcare services that were not administered as represented, were not medically necessary, and in violation of Illinois law.

791. All of the fraudulent documentation for healthcare services that was allegedly dispensed to T.T. was sent through the U.S. Mail.

**Claimant: A.V.**
**DOL: October 3, 2023**
**Allstate Claim No.: 0732602032**

792.    On October 3, 2023, Allstate claimant, A.V., was reportedly involved in a motor vehicle accident in Chicago, IL. As a result of the accident, A.V. reportedly sustained soft-tissue injuries to her lower back and left shoulder.

793.    Pursuant to the records and invoices submitted by Medical Doctor 2, on October 6, 2023, A.V. consulted with Medical Doctor 2 at ASR's Western Avenue location.

794.    Medical Doctor 2 billed A.V. $505.00 pursuant to CPT code 99244 – Modifier 95, representing that he consulted with A.V. at the behest of another, unnamed provider, by way of "telemedicine … using an interactive audio and video telecommunications system in real time."

795.    At the time of the alleged consultation, Medical Doctor 2 noted that A.V. had neck pain rather than the lower back pain she claimed. A.V. has denied that she had or ever reported any neck pain to Medical Doctor 2.

796.    At the time of the alleged consultation, Medical Doctor 2 purportedly instructed A.V. to start physical therapy 2-3 times a week, for 4-6 weeks. While Medical Doctor 2 did not specifically instruct A.V. to consult with ASR for the prescribed physical therapy, the submitted invoice documenting the consultation suggests that Medical Doctor 2 purportedly performed the telemedicine consultation while A.V. was visiting the Western Avenue address where ASR, Advanced Care, Midwest, and Promedix are all located.

797.   At the time of the alleged first consultation, Medical Doctor 2 also purportedly wrote the following medication prescriptions:

- Cyclobenzaprine (muscle relaxant);
- Meloxicam (non-steroidal, anti-inflammatory drug ("NSAID")); and
- Diclofenac gel.

798.   Medical Doctor 2 also purportedly wrote A.V. a prescription for a TENS unit.

799.   A.V., however, has confirmed that she did not meet or consult with Medical Doctor 2 in person or via telehealth on October 6, 2023. As such, the record, the prescriptions, and the invoices submitted by Medical Doctor 2 for this date of service are false.

800.   A.V. further reports that following the accident, she only consulted with a chiropractor at the Western Avenue location of ASR.

801.   ASR has submitted a record and bill representing that Dr. Karban consulted with A.V. for the first time on October 17, 2023. ASR billed for that consultation pursuant to CPT Code 99203, representing that A.V. was a new patient, and that her visit lasted approximately 30–44 minutes.

802.   To create the impression that Medical Doctor 2 examined A.V. on October 6, 2023 when he did not, Dr. Karban reported in his October 17, 2023 record that A.V. was referred to ASR by Medical Doctor 2. This record is false because Medical Doctor 2 had not met or consulted with A.V. by this time.

803.   According to A.V., after a cursory examination, Dr. Karban told her that he would be shipping medication to her home.  No further details were provided.  However, as a chiropractor, Dr. Karban was not legally allowed to treat or prescribe medication to patients in Illinois.

804. Based upon the evidence gathered during Allstate's investigation, Dr. Karban, ASR and/or Dr. Vandenelzen have circumvented the applicable law by creating false records suggesting that a physician or other qualified medical provider authorized to do so, wrote the prescriptions for medication for A.V. contemporaneously with a consultation that never happened.

805. Neither Dr. Karban nor any other employee of ASR told A.V. how much she would be charged for the medication. Even if a legitimate prescription was written, A.V. was not given a copy of the prescription, nor the opportunity to select a pharmacy of her choice.

806. Instead, on October 6, 2023, at the behest of Dr. Karban, ASR, and Dr. Vandenelzen, Advanced Care automatically and falsely reported that it received three electronic prescriptions from Physician Assistant 3. There is no record to suggest that Physician Assistant 3 examined or consulted with A.V. by way of telemedicine or otherwise.

807. Although Advanced Care falsely reported that A.V. signed for her medications and refused to be counseled by a pharmacist, no one employed by or otherwise affiliated with Advanced Care attempted to communicate with A.V. before the medications were shipped.

808. Advanced Care, in fact, dispensed the medications to A.V. by way of the U.S. Mail, and billed A.V. $1,287.58 pursuant to CPT code 99070, falsely representing that on October 9, 2023, an unidentified physician dispensed the medication.

809. Pursuant to Advanced Care's records, Hussein, PharmD dispensed Diclofenac gel, Meloxicam, and Cyclobenzaprine to A.V. in person, while she was at the Western Avenue location.

810. Moreover, and perhaps more importantly, A.V. has confirmed that she did not receive Meloxicam from Advanced Care, nor any other provider.

811.    According to A.V., on her first visit, Dr. Karban also told her that a TENS unit would be shipped to her home.

812.    A true and accurate example of the prescription is set out below:



813.    Even though the TENS unit prescription was fraudulent, Midwest dispensed a TENS unit, which it purportedly shipped to A.V., in Illinois, via Fed Ex, from Dallas, Texas.

814.    Neither Dr. Karban, nor anyone employed at Midwest informed A.V. that Midwest was not a licensed DME supplier in Illinois.

-120-

815. Neither Dr. Karban, nor anyone employed at Midwest informed A.V. that Dr. Vandenelzen, the owner of ASR and Advanced Care, was also the owner of Midwest.

816. Even though the DME prescription purportedly written by Medical Doctor 2 was bogus, Midwest billed A.V. $600.00 pursuant to HCPCS E0730, representing that it supplied A.V. with a "[t]ranscutaneous electrical nerve stimulation (TENS) device, four or more leads, for multiple nerve stimulation."

817. Based on information provided by Allstate claimants, Midwest dispensed a Health Herald Digital Therapy Machine to A.V., which can be purchased from an online retailer for under $30.00.

818. Midwest also billed A.V. $100.00 pursuant to HCPCS A9901, representing that an employee of Midwest set-up and trained A.V. on how to operate the TENS unit on October 17, 2023.

819. A.V., however, confirmed that no one trained her on how to operate the TENS unit.

820. A.V. further confirmed that whenever she performed therapeutic exercises at ASR, an unidentified assistant, whose credentials and qualifications are unknown, told A.V. which exercises to do, demonstrated how the exercises should be performed, and monitored her performance of the exercises thereafter.

821. Dr. Karban and ASR, however, billed A.V. $130.00 per unit (each unit being 15 minutes) for therapeutic exercises pursuant to CPT code 97110, falsely representing that Dr. Karban provided A.V. with direct, one-on-one supervision during the exercises.

822. Based on information provided by Allstate claimants, Dr. Karban and ASR intentionally concealed the identity of the persons actually rendering the services from their

records because the persons actually administering the therapeutic exercises are not qualified healthcare professionals.

823.    Pursuant to A.V.'s records, on her first visit to ASR, Dr. Karban also prescribed a lumbar back brace using a pre-printed form provided by Midwest.

824.    A true and accurate copy of the lumbar back brace prescription to A.V. is depicted below:



825.    Based upon the documentation submitted to Allstate by the Defendants, Dr. Karban or an employee of ASR sent the back brace prescription directly to Midwest given that Midwest is located at the same address as ASR (the Western Avenue address).

826.    Pursuant to Midwest's records, it did not dispense the back brace to A.V. until December 7, 2023. Because of the two month delay, the brace was not medically necessary,

especially since she continued to improve from her injuries from the time when the brace was prescribed until it was ultimately provided.

827.    Midwest billed A.V. $2,500.00 pursuant to HCPCS L0637, representing that it dispensed the brace, and that a qualified "individual with expertise… trimmed, bent, molded, assembled, or otherwise customized" the lumbar-sacral orthosis (back brace) for A.V.

828.    Based upon the documentation submitted to Allstate by the Defendants, the back brace supplied to A.V. was an Athena LSO back brace.

829.    Similar back braces can be purchased from retailers online for less than $180.00.

830.    Midwest also billed A.V. $100.00 pursuant to HCPCS A9901, representing that an employee of Midwest set-up and trained A.V. on how to operate the back brace. By billing pursuant to HCPCS L0637 and A9901, Midwest improperly double billed A.V. for the set-up and training allegedly provided to A.V.

831.    Pursuant to the records and invoices submitted by Medical Doctor 2, on November 3, 2023, A.V. consulted with Medical Doctor 2 a second time at ASR's Western Avenue location.

832.    Medical Doctor 2 billed A.V. $285.00 for the second consultation pursuant to CPT code 99214, representing that he performed a comprehensive examination of A.V.

833.    Based on the records submitted, at the time of the alleged second consultation, Medical Doctor 2 purportedly instructed A.V. to return for a follow-up appointment in approximately 30 days.

834.    Medical Doctor 2 purportedly instructed A.V. to continue with physical therapy at ASR.

835.     Medical Doctor 2 purportedly instructed A.V. to continue taking the medication allegedly prescribed on October 6, 2023.

836.     A.V., however, has confirmed that she did not consult with Medical Doctor 2 in person or via telehealth on November 3, 2023. As such, the record, and the invoice submitted by Medical Doctor 2 for this date of service are false.

837.     Pursuant to the records and invoices submitted by Medical Doctor 2, on December 1, 2023, A.V. consulted with Medical Doctor 2 a third time at ASR's Western Avenue location.

838.     Medical Doctor 2 billed A.V. $285.00 for the third consultation pursuant to CPT code 99213, representing that he performed a comprehensive examination of A.V.

839.     And despite A.V.'s reported improvement at the time of the third consultation, Medical Doctor 2 purportedly instructed A.V. to submit for an MRI of the lumbar spine.

840.     At the time of the alleged third consultation, Medical Doctor 2 purportedly instructed A.V. to continue with physical therapy at ASR.

841.     Medical Doctor 2 purportedly instructed A.V. to continue taking the medication allegedly prescribed to her on October 6, 2023.

842.     A.V., however, has confirmed that she did not consult with Medical Doctor 2 in person or via telehealth on December 1, 2023. As such, the record, and the invoice submitted by Medical Doctor 2 for this date of service are false.

843.     According to A.V., Dr. Karban instructed her to get an MRI. Dr. Karban and ASR, however, do not reference this fact in their records.

844.     Pursuant to the records and invoices submitted by Medical Doctor 2, on December 20, 2023, A.V. consulted with Medical Doctor 2 a fourth time at ASR's Western Avenue location.

-124-

845.     Medical Doctor 2 billed A.V. $200.00 for the fourth consultation pursuant to CPT code 99213, representing that he performed a comprehensive examination of A.V. via telehealth.

846.     Although Medical Doctor 2 reported that he reviewed the MRI scan findings, he did not relate any issue depicted therein to the October 3, 2023 motor vehicle accident.

847.     And despite A.V.'s continued improvement, at the time of the fourth consultation, he purportedly instructed A.V. to undergo bilateral lumbar facet joint injections.

848.     A.V., however, has confirmed that she did not consult with Medical Doctor 2 in person or via telehealth on December 20, 2023. As such, the record, the instruction to undergo the facet joint injection, and the invoice submitted by Medical Doctor 2 for this date of service are false.

849.     In fact, A.V. has confirmed that the only time she met with Medical Doctor 2, in any way, was when she presented to Metro for the lumbar facet joint injections, and that it was Dr. Karban who unlawfully prescribed the injections – not Medical Doctor 2.

850.     Based upon the evidence gathered during Allstate's investigation, at the direction of Dr. Karban, an employee of ASR and/or Metro scheduled A.V.'s injection procedures.

851.     Neither Medical Doctor 2, nor anyone employed at Metro informed A.V. about Medical Doctor 2's referral arrangement with Dr. Vandenelzen, and his businesses.

852.     Neither Medical Doctor 2, nor anyone employed at Metro informed A.V. that Metro was not a licensed ambulatory surgery center.

853.     On January 10, 2024, Promedix automatically and falsely reported that it received an electronic prescription from Medical Doctor 2 for a ten-day supply of Ondansetron (an

excessive amount by any means) in anticipation of A.V.'s facet joint injection. Up until this point, Medical Doctor 2 had never met with or consulted with A.V.

854.    Because the prescription for Ondansetron was automatically generated, Promedix billed A.V. $796.60 pursuant to CPT code 99070, representing that an unidentified physician dispensed the medication.

855.    Pursuant to Promedix's records, that Hussein PharmD dispensed the medication directly to A.V. at the Western Avenue address on January 10, 2024.

856.    The prescription was purportedly filled at Promedix, without A.V.'s knowledge or consent. A.V. confirmed that she did not receive the Ondansetron.

857.    Promedix also falsely reported that A.V. signed for the Ondansetron, but refused to be counseled by a pharmacist, when, in fact, no one affiliated with Promedix attempted to communicate with A.V. before the medications were allegedly shipped.

858.    On January 26, 2024, A.V. presented to Metro at the Laramie Avenue address under the direction of an employee of ASR and/or Metro.

859.    After having introduced himself to A.V., Medical Doctor 2, apparently administered the facet joint injections into the right and left side of A.V.'s lumbar facet joint, using local anesthesia.

860.    As a result of the referral from Dr. Karban, ASR, and Dr. Vandenelzen, Medical Doctor 2 was able to bill A.V. $10,630.00 pursuant to CPT codes 64493 and 64494, representing that he administered the facet joint injections.

861. Metro billed A.V. $19,500.00 for these exact same services pursuant to CPT codes 64493 and 64494, with the Modifier – SG, misrepresenting that Metro is a surgical center, when it is unlicensed.

862. Metro did not provide a breakdown of the services it purportedly provided in any records submitted with its bills. Nor did it provide any records that demonstrates the origin of the medication purportedly injected into A.V.

863. The Defendants fraudulently billed A.V. for healthcare services that were not administered as represented, were not medically necessary, and in violation of Illinois law.

864. All of the fraudulent documentation for healthcare services that was allegedly dispensed to A.V. was sent through the U.S. Mail.

## VII. MATERIAL MISREPRESENTATIONS AND JUSTIFIABLE RELIANCE

### A. MATERIAL MISREPRESENTATIONS MADE BY DEFENDANTS

865. The Defendants submitted, or caused to be submitted, documentation that misrepresented and omitted material facts about the billed-for healthcare services to induce Allstate to pay the fraudulent charges for unlicensed, unlawful, and unnecessary healthcare services.

866. The Defendants fraudulent scheme involved billing for healthcare services for the benefit of Allstate claimants, including (1) unlicensed ambulatory surgery center fees; (2) unlicensed DME fees; (3) billing for treatment not rendered; (4) unlawful referrals and prescriptions; (5) for unnecessary healthcare services provided pursuant to a pre-determined treatment protocol; and (6) at grossly excessive charges.

867.     The Defendants' invoices were issued on Health Insurance Claim Forms (HCFA), which are medical billing forms approved by the National Uniform Claim Committee (NUCC).

868.     All HCFA forms contain the following warning in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

869.     As alleged herein, the Defendants ignored this warning; instead, they created and submitted a multitude of records and bills on behalf of Advanced Care, ASR, Midwest, Metro, and Promedix that contained false information.

870.     The Defendants attested to the necessity of the billed healthcare services through these records and bills, which the Defendants mailed to Allstate using the U.S. Mail.

871.     Every record and bill created and mailed by the Defendants constitutes a material misrepresentation so long as the records and bills relate to Advanced Care, ASR, Midwest, Metro, and Promedix charges for (a) services that were unnecessary, (b) services that were rendered in violation of Illinois law, and (c) services that were not rendered at all or as represented.

872.     The Defendants knew, and it was reasonably foreseeable, that their patients, or their patients' representatives, would submit the Defendants' bills, and related documentation, through the U.S. Mail when they sought claim-settlement payments from Allstate.

873.     In these instances, documents submitted to Allstate through the U.S. Mail included records and bills generated by the Defendants with respect to Advanced Care, ASR, Midwest, Metro, and Promedix.

874.   As part of this scheme, Defendants intended for Allstate to act in reliance on the statements and representations contained in the records and bills concerning the DME.

875.   In reasonable reliance on the statements and representations contained in the records and bills, Allstate did in fact tender payment to Advanced Care, Advance Holdings, ASR, Midwest, Metro, and Promedix.

## B.   ALLSTATE'S JUSTIFIABLE RELIANCE

876.   At all relevant times, the Defendants acted with the intent to conceal from Allstate their misconduct in connection with the scheme to defraud.

877.   The Defendants submitted, or caused to be submitted, records, and itemized billing statements detailing the healthcare services rendered to Allstate claimants.

878.   The Defendants created records, reports, and bills knowing that these documents would be submitted to Allstate in support of settlement demand letters, which contained representations that the healthcare services were rendered, lawful, and necessary to address the injuries purportedly suffered by the Allstate claimants.

879.   The Defendants knowingly misrepresented and concealed material facts to prevent Allstate from discovering that the Defendants billed Allstate for (1) unlicensed ambulatory surgery center fees; (2) unlicensed DME fees; (3) billing for treatment not rendered; (4) unlawful referrals and prescriptions; (5) for unnecessary healthcare services provided pursuant to a pre-determined treatment protocol; and (6) at grossly excessive charges.

880.   Each individual billing statement submitted to Allstate references the date of service(s).

881. The Defendants' records identify the claimants' name, date of loss, date of service, the type of product and service purportedly provided, and the amount billed for such service.

882. The Defendants knowingly misrepresented and concealed material facts to prevent Allstate from discovering that the healthcare services provided by the Defendants were not lawfully rendered and not compensable under Illinois law.

883. The Defendants' acts were self-concealing by their very nature.

884. When Allstate receives treatment documentation from a provider, such documentation is reviewed and processed in accordance with the applicable statutes and regulations governing the adjustment of insurance claims.

885. Specifically, records and invoices are reviewed to determine (a) whether the purported healthcare treatment is a covered service, (b) whether coverage exists under the applicable policy of insurance, and (c) the sufficiency of the charged amount under the applicable fee schedule(s).

886. Moreover, when Allstate receives a settlement demand from a claimant or the claimant's personal injury attorney, the contents of the demand are analyzed to determine (a) whether coverage exists under the applicable policy of insurance, and (b) whether the claimant's alleged injuries warrant a payment or settlement sufficient to compensate the claimant for the expenses incurred, and any bodily injury suffered as a result of the covered event (i.e., the subject motor vehicle accident).

887. Allstate diligently reviewed each of the Defendants' submissions upon receipt.

888. The Defendants' wrongdoing was not discovered during this period.

889.     Given the clandestine nature of the Defendants' scheme, it was impossible for Allstate to discover a clear pattern of misconduct during Allstate's investigation into each discrete insurance claim associated with the Defendants' scheme.

890.     Despite its due diligence, Allstate did not discover the Defendants' deception and the resulting injuries caused by such deception until shortly before filing this Complaint.

891.     Had Allstate not been misled by the representations contained in the Defendants' documentation and associated settlement demands, no payments would have been made on these claims.

## VIII.   <u>SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY</u>

892.     The Defendants created, prepared, and submitted false documentation, and intentionally violated the laws of the United States by creating schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing or causing to be placed, in a post office and/or authorized depository for mail documents to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing such fraudulent schemes and attempting to do so.

893.     The treatment purportedly provided and billed for by the Defendants was fraudulent because the Defendants billed for healthcare services to or for the benefit of Allstate claimants for (1) unlicensed ambulatory surgery center fees; (2) unlicensed DME fees; (3) billing for treatment not rendered; (4) unlawful referrals and prescriptions; (5) for unnecessary healthcare services provided pursuant to a pre-determined treatment protocol; and (6) at grossly excessive charges.

894.     The Defendants knew that the extent and fact of treatment would be used to inflate and bolster personal-injury claims submitted to Allstate on behalf of the claimants.

895.    The objective of the scheme to defraud Allstate was to collect insurance benefits that the Defendants were not entitled since the services rendered, if at all, were not necessary and because the Defendants engaged in fraudulent billing practices.

896.    This objective necessarily required the submission of claims to Allstate.

897.    The Defendants created, prepared, and submitted false documentation and placed in a post office and/or authorized depository for mail documents to be sent and delivered by the United States Postal Service, and packages sent between states by way of Fed Ex.

898.    Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, HCPCS code sheets, referrals, prescriptions, patient checklists, letters and request for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

899.    Every automobile insurance claim detailed herein involved at least two uses of the U.S. Mail, including the mailing of the notice of claim(s), initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

900.    Allstate estimates that the scheme detailed herein generated hundreds of mailings. Tables listing examples of mailings made in furtherance of this scheme are annexed hereto as Exhibits 5-9.

901.    The Defendants mailed (or caused the mailing of) documents, including records and bills that materially misrepresented that the Defendants were providing and properly billing for necessary treatment.

902. The Defendants knew, and it was reasonably foreseeable, that their documents would be mailed to Allstate through the U.S. Mail in support of claims made on their patients' behalf, including the representative mailings detailed in Exhibits 5-9 annexed hereto.

903. It was within the ordinary course of business for the Defendants to submit claims for reimbursement to insurance carriers like Allstate through the U.S. Mail.

904. As the Defendants agreed to use (and did in fact use) the mail system in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Allstate policies and state law the Defendants committed mail fraud, as defined in 18 U.S.C. § 1341. Tables detailing representative examples of the mail fraud agreed to and perpetrated by these Defendants are annexed hereto as Exhibits 5-9 and includes specific information regarding the date, the sender, the recipient, and the content of the Defendants' fraudulent mailings.

905. The representative mailings identified in Exhibits 5-9 contain misrepresentations of fact regarding the lawfulness, necessity and fact of the treatment for which Allstate was billed.

906. Allstate reasonably relied on the submissions it received by, and/or on behalf of, and/or with the knowledge of the Defendants through the U.S. Mail in tendering payment to the Defendants, including those payments detailed in Exhibits 10-14.

907. The Defendants' fraudulent scheme went undetected until Allstate had sustained substantial financial injury. The Defendants' fraudulent scheme was self-concealing by its very nature—false medical records and false invoices appearing legitimate on their face.

908. As the Defendants agreed to pursue the same criminal objective (namely, mail fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## IX.  **DAMAGES**

909.    The Defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of federal and state law.

910.    Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's present injury includes, but is not limited to, compensatory damages for payments made directly to the Defendants in connection with medical expense claims and bodily injury claims, the exact amount to be determined at trial, including:

   a.  Payments made to Advanced Care Rx LLC totaling at least $131,924.00, the exact amount to be determined at trial. The chart at Exhibit 10 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Advanced Care Rx LLC in connection with first-party and third-party claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

   b.  Payments made to Advance Specialists Holdings S.C. totaling at least $62,327.72, the exact amount to be determined at trial. The chart at Exhibit 11 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Advance Specialists Holdings S.C. in connection with first-party and third-party claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

   c.  Payments made to JLV1, S.C. d/b/a Advance Spine & Rehab Center totaling at least $456,970.94, the exact amount to be determined at trial. The chart at Exhibit 12 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to JLV1, S.C. d/b/a Advance Spine & Rehab Center in connection with first-party and third-party claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

   d.  Payments made to Metro North Surgical S.C. totaling at least $345,449.99, the exact amount to be determined at trial. The chart at Exhibit 13 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Metro North Surgical S.C. in connection with first-party and third-party claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

   e.  Payments made to Midwest Pain Specialists S.C. totaling at least $146,522.97, the exact amount to be determined at trial. The chart at Exhibit 14 and incorporated herein

as if set forth in its entirety, identifies Allstate's payments to Midwest Pain Specialists S.C. in connection with first-party and third-party claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

## X. CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ADVANCED CARE RX LLC ENTERPRISE
### (Against Jamie Vandenelzen, D.C., Arash Raei, PharmD, and Faisal Sahawneh, PharmD)

911. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-910 as if set forth fully herein.

912. Advanced Care Rx LLC ("Advanced Care") constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

913. Allstate is a "person" as defined by 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

914. In furtherance of their operation and management of Advanced Care, Jamie Vandenelzen, D.C., Arash Raei, PharmD, and Faisal Sahawneh, PharmD(collectively, the "Count I Defendants") intentionally prepared and mailed, or caused to be prepared and mailed, medication, prescriptions, and false claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

915. The Count I Defendants employed two (2) or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 5.

916.    Among other things, the Count I Defendants sent medication, prescriptions, notes, invoices, health insurance claim forms, and other documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

917.    Policies of insurance and medication were delivered to Allstate claimants through the U.S. Mail.

918.    Payments made by Allstate were delivered through the U.S. Mail.

919.    As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, claim-related documentation to Allstate related to medication purportedly provided by Advanced Care for collecting payment from Allstate under the medical expense and bodily-injury benefits portion of the Allstate policies and applicable Illinois laws.

920.    In reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Advanced Care for the benefit of the Count I Defendants that would not otherwise have been paid.

921.    The Count I Defendants' pattern of preparing and mailing or causing and/or directing the preparation and mailing of, these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count I Defendants to continue perpetrating this scheme without being detected.

922.    The facts set forth above constitute indictable offense pursuant to 18 U.S.C. § 1341 (mail fraud).

923.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Advanced Care for the benefit of the Count I Defendants.

924.    Allstate is in the business of writing insurance and paying claims in the State of Illinois.  Insurance fraud schemes practiced here and elsewhere have a harmful impact on Allstate's overall financial well-being and adversely affects insurance rates.

925.    The Count I Defendants associated with the foregoing enterprise and participated–both directly and indirectly–in the conduct of this enterprise through a pattern of racketeering activities.

926.    By means of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ADVANCED CARE RX LLC ENTERPRISE**
**(Against Jamie Vandenelzen, D.C., Arash Raei, PharmD, and Faisal Sahawneh, PharmD)**

927.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-910 as if set forth fully herein.

928.    Through their participation in the operation and management of Advanced Care Rx LLC ("Advanced Care"), Jamie Vandenelzen, D.C., Arash Raei, PharmD, and Faisal Sahawneh, PharmD (collectively, the "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

-137-

929. The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Advanced Care by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 5, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

930. The purpose of the conspiracy was to obtain payments from Allstate on behalf of Advanced Care, even though Advanced Care, because of the Count II Defendants' unlawful conduct, was not eligible to collect such payments.

931. The Count II Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including, but not limited to, the creation of insurance claim documents containing material misrepresentations and/or material omissions.

932. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as result of the Count II Defendants' unlawful conduct described herein.

933. By violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Count II Defendants identified, three (3) times the damages sustained by reason of the claims submitted by the Count II Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### JLV1, S.C. d/b/a ADVANCE SPINE & REHAB CENTER ENTERPRISE
### (Against Jamie Vandenelzen, D.C., Ansu Durgut, D.C., Alex Karban, D.C., and Advance Specialists Holdings S.C.)

934.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-910 as if set forth fully herein.

935.    JLV1, S.C. d/b/a Advance Spine & Rehab Center ("ASR") constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

936.    In furtherance of their operation and management of ASR, Jamie Vandenelzen, D.C., Ansu Durgut, D.C., Alex Karban, D.C., and Advance Specialists Holdings S.C. (collectively, the "Count III Defendants") intentionally prepared and mailed, or caused to be prepared and mailed, false claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

937.    The Count III Defendants employed two (2) or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibits 6-7.

938.    Among other things, the Count III Defendants sent notes, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

939.    Policies of insurance were delivered to Allstate claimants through the U.S. Mail.

940.    Payments made by Allstate were delivered through the U.S. Mail.

941.    As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, claim-related documentation to Allstate related to services

provided by ASR for collecting payment from Allstate under the medical expense and bodily-injury benefits portion of the Allstate policies and applicable Illinois laws.

942.    Because of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representation, Allstate, by its agents and employees, issued drafts to ASR for the benefit of the Count III Defendants that would not otherwise have been paid.

943.    The Count III Defendants' pattern of preparing and mailing, or causing and/or directing the preparation and mailing of, these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count III Defendants to continue perpetrating this scheme without being detected.

944.    The facts set forth above constitute an indictable offense pursuant to 18 U.S.C. § 1341 (mail fraud).

945.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to ASR for the benefit of the Count III Defendants.

946.    Allstate is in the business of writing insurance and paying claims in the State of Illinois. Insurance fraud schemes practiced here and elsewhere have a harmful impact on Allstate's overall financial well-being and adversely affects insurance rates.

947.    The Count III Defendants associated with the foregoing enterprise, and participated–both directly and indirectly–in the conduct of this enterprise through a pattern of racketeering activities.

948.     By means of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**JLV1, S.C. d/b/a ADVANCE SPINE & REHAB CENTER ENTERPRISE**
**(Against Jamie Vandenelzen, D.C., Ansu Durgut, D.C., Alex Karban, D.C., and Advance Specialists Holdings S.C.)**

949.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-910 as if set forth fully herein.

950.     Through their participation in the operation and management of JLV1, S.C. d/b/a Advance Spine & Rehab Center ("ASR"), Jamie Vandenelzen, D.C., Ansu Durgut, D.C., Alex Karban, D.C., and Advance Specialists Holdings S.C.  (collectively, the "Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

951.     The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of ASR. In furtherance of their operation and management of ASR, the Count IV Defendants, by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibits 6-7, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

952.     The purpose of the conspiracy was to obtain payments from Allstate on behalf of ASR, even though ASR, because of the Count IV Defendants' unlawful conduct, was not eligible to collect such payments.

953.    The Count IV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including, but not limited to, the creation of insurance claim documents containing material misrepresentations and/or material omissions.

954.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as result of the Defendants' unlawful conduct described herein.

955.    By violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified, three (3) times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

### COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### METRO NORTH SURGICAL S.C. ENTERPRISE
### (Against Jamie Vandenelzen, D.C.)

956.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-910 as if set forth fully herein.

957.    Metro North Surgical S.C. ("Metro") constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

958.    In furtherance of their operation and management of Metro, Jamie Vandenelzen, D.C. (collectively, the "Count V Defendants") intentionally prepared and mailed, or caused to be prepared and mailed, false claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

959.     The Count V Defendants employed two (2) or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 8.

960.     Among other things, the Count V Defendants sent notes, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

961.     Policies of insurance were delivered to Allstate claimants through the U.S. Mail.

962.     Payments made by Allstate were delivered through the U.S. Mail.

963.     As documented above, the Count V Defendants repeatedly and intentionally submitted, or caused to be submitted, claim-related documentation to Allstate related to services provided by Metro for collecting payment from Allstate under the medical expense and bodily injury benefits portion of the Allstate policies and applicable Illinois laws.

964.     Because of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representation, Allstate, by its agents and employees, issued drafts to Metro for the benefit of the Count V Defendants that would not otherwise have been paid.

965.     The Count V Defendants' pattern of preparing and mailing, or causing and/or directing the preparation and mailing of, these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count V Defendants to continue perpetrating this scheme without being detected.

966.    The facts set forth above constitute indictable offense pursuant to 18 U.S.C. § 1341 (mail fraud).

967.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Metro for the benefit of the Count V Defendants.

968.    Allstate is in the business of writing insurance and paying claims in the State of Illinois.  Insurance fraud schemes practiced here and elsewhere have a harmful impact on Allstate's overall financial well-being and adversely affects insurance rates.

969.    The Count V Defendants associated with the foregoing enterprise, and participated–both directly and indirectly–in the conduct of this enterprise through a pattern of racketeering activities.

970.    By means of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### METRO NORTH SURGICAL S.C. ENTERPRISE
### (Against Jamie Vandenelzen, D.C.)

971.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-910 as if set forth fully herein.

972.    Through their participation in the operation and management of Metro North Surgical S.C. ("Metro"), Jamie Vandenelzen, D.C. (collectively, the "Count VI Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

973. The Count VI Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Metro by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 8, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

974. The purpose of the conspiracy was to obtain payments from Allstate on behalf of Metro, even though Metro, because of the Count VI Defendants' unlawful conduct, was not eligible to collect such payments.

975. The Count VI Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including, but not limited to, the creation of insurance claim documents containing material misrepresentations and/or material omissions.

976. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as result of the Defendants' unlawful conduct described herein.

977. By violation of 18 U.S.C. § 1962(d), the Count VI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified, three (3) times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**MIDWEST PAIN SPECIALISTS S.C. ENTERPRISE**
**(Against Jamie Vandenelzen, D.C.)**

978.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-910 as if set forth fully herein.

979.    Midwest Pain Specialists S.C. ("Midwest") constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

980.    In furtherance of their operation and management of Midwest, Jamie Vandenelzen, D.C.(collectively, the "Count VII Defendants") intentionally prepared and mailed, or caused to be prepared and mailed, false claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

981.    The Count VII Defendants employed two (2) or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 9.

982.    Among other things, the Count VII Defendants notes, invoices, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

983.    Policies of insurance were delivered to Allstate claimants through the U.S. Mail.

984.    Payments made by Allstate were delivered through the U.S. Mail.

985.    As documented above, the Count VII Defendants repeatedly and intentionally submitted, or caused to be submitted, claim-related documentation to Allstate related to services

provided by Midwest for collecting payment from Allstate under the medical expense and bodily-injury benefits portion of the Allstate policies and applicable Illinois laws.

986.    Because of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representation, Allstate, by its agents and employees, issued drafts to Midwest for the benefit of the Count VII Defendants that would not otherwise have been paid.

987.    The Count VII Defendants' pattern of preparing and mailing, or causing and/or directing the preparation and mailing of, these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count VII Defendants to continue perpetrating this scheme without being detected.

988.    The facts set forth above constitute indictable offense pursuant to 18 U.S.C. § 1341 (mail fraud).

989.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Midwest for the benefit of the Count VII Defendants.

990.    Allstate is in the business of writing insurance and paying claims in the State of Illinois.  Insurance fraud schemes practiced here and elsewhere have a harmful impact on Allstate's overall financial well-being and adversely affects insurance rates.

991.    The Count VII Defendants associated with the foregoing enterprise, and participated–both directly and indirectly–in the conduct of this enterprise through a pattern of racketeering activities.

992.     By means of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT VIII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**MIDWEST PAIN SPECIALISTS S.C. ENTERPRISE**
**(Against Jamie Vandenelzen, D.C.)**

993.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-910 as if set forth fully herein.

994.     Through their participation in the operation and management of Midwest Pain Specialists S.C. ("Midwest"), Jamie Vandenelzen, D.C.(collectively, the "Count VIII Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

995.     The Count VIII Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Midwest by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 9, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

996.     The purpose of the conspiracy was to obtain payments from Allstate on behalf of Midwest, even though Midwest, because of the Count VIII Defendants' unlawful conduct, was not eligible to collect such payments.

997.     The Count VIII Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including, but not limited to, the creation of insurance claim documents containing material misrepresentations and/or material omissions.

998.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as result of the Defendants' unlawful conduct described herein.

999.    By violation of 18 U.S.C. § 1962(d), the Count VIII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified, three (3) times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT IX**
**VIOLATION OF 720 ILCS 5/17-10.5**
**(Against all Defendants)**

1000.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-910 as if set forth fully herein.

1001.    Jamie Vandenelzen, D.C., Ansu Durgut, D.C., Arash Raei, PharmD, Faisal Sahawneh, PharmD, Alex Karban, D.C., Promedix, P.C., Advanced Care Rx LLC, JLV1, S.C. d/b/a Advance Spine & Rehab Center, Advance Specialists Holdings S.C., Metro North Surgical S.C., and Midwest Pain Specialists S.C. (collectively, the "Count IX Defendants") violated 720 ILCS 5/17-10.5 by, among other things, billing (1) unlicensed ambulatory surgery center fees; (2) unlicensed DME fees; (3) treatment not rendered; (4) unlawful referrals and prescriptions; (5) unnecessary healthcare services provided pursuant to a pre-determined treatment protocol; and (6) at grossly excessive charges.

1002.   The Count IX Defendants' scheme to defraud Allstate included a succession of misrepresentations and omissions of material fact related the eligibility of Advanced Care, ASR, Midwest, Metro, and Promedix, for and entitlement to reimbursement under Illinois law.

1003.   The Count IX Defendants' misrepresentations and omissions of material fact were conveyed through statements made in Advanced Care, ASR, Midwest, Metro, and Promedix's records, documents, notes, reports, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment.

1004.   The Count IX Defendants' statements and representations were false, or they at least required the disclosure of additional facts to render the documents, information, and materials furnished not misleading.

1005.   The Count IX Defendants knew that Allstate would rely on Advanced Care, ASR, Midwest, Metro, and Promedix's documents when deciding to pay claims so they purposely and intentionally misrepresented or omitted material facts to induce Allstate into making payment on the claims.

1006.   Allstate reasonably relied, to its detriment, upon the Count IX Defendants' misrepresentations and omissions of material fact concerning the patients' injuries, the necessity of the DME and services that were billed for, and Advanced Care, ASR, Midwest, Metro, and Promedix's right to be paid.

1007.   Allstate incurred damages based upon the Count IX Defendants' misrepresentations and omissions of material fact, as set forth in Exhibits 10-14.

1008.   Allstate's damages include, but are not necessarily limited to, (a) the total amount actually paid by Allstate in connection with the Count IX Defendants' false claims (subject to

mandatory trebling) as set out in Exhibits 10-14, and/or (b) the total amount that the Count IX Defendants sought or attempted to collect from Allstate in cases where no payment was made (subject to mandatory doubling), as set out in Exhibits 15-20.

**COUNT X**
**COMMON LAW FRAUD**
**(Against all Defendants)**

1009.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-910 as if set forth fully herein.

1010.   Jamie Vandenelzen, D.C., Ansu Durgut, D.C., Arash Raei, PharmD, Faisal Sahawneh, PharmD, Alex Karban, D.C., Promedix, P.C., Advanced Care Rx LLC, JLV1, S.C. d/b/a Advance Spine & Rehab Center, Advance Specialists Holdings S.C., Metro North Surgical, and Midwest Pain Specialists S.C. (collectively, the "Count X Defendants") committed fraud by, among other things, billing (1) unlicensed ambulatory surgery center fees; (2) unlicensed DME fees; (3) treatment not rendered; (4) unlawful referrals and prescriptions; (5) unnecessary healthcare services provided pursuant to a pre-determined treatment protocol; and (6) at grossly excessive charges.

1011.   The Count X Defendants' scheme to defraud Allstate was dependent upon a succession of misrepresentations and omissions of material fact related to Advanced Care, ASR, Metro, Midwest, and Promedix's eligibility for and entitlement to reimbursement under Illinois law.

1012.   The Count X Defendants' misrepresentations and omissions of material fact were conveyed through statements made in Advanced Care, ASR, Metro, Midwest, and Promedix's

-151-

records, documents, notes, reports, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment.

1013. The Count X Defendants' statements and representations were false, or they at least required the disclosure of additional facts to render the documents, information, and materials furnished not misleading.

1014. The Count X Defendants knew that Allstate would rely on Advanced Care, ASR, Metro, Midwest, and Promedix's documents when deciding to pay claims, so they purposely and intentionally misrepresented or omitted material facts to induce Allstate into making payment on the claims.

1015. Allstate's damages include, but are not necessarily limited to, the total amount actually paid by Allstate in connection with the Count X Defendants' false claims ($1,143,195.62).

## COUNT XI
### ILLINOIS UNJUST ENRICHMENT
#### (Against all Defendants)

1016. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-910 as if set forth fully herein.

1017. Jamie Vandenelzen, D.C., Ansu Durgut, D.C., Arash Raei, PharmD, Faisal Sahawneh, PharmD, Alex Karban, D.C., Promedix, P.C., Advanced Care Rx LLC, JLV1, S.C. d/b/a Advance Spine & Rehab Center, Advance Specialists Holdings S.C., Metro North Surgical S.C., and Midwest Pain Specialists S.C. (collectively, the "Count XI Defendants") were unjustly enriched by billing (1) unlicensed ambulatory surgery center fees; (2) unlicensed DME fees; (3) treatment not rendered; (4) unlawful referrals and prescriptions; (5) unnecessary healthcare

services provided pursuant to a pre-determined treatment protocol; and (6) at grossly excessive charges.

1018.  The Count XI Defendants' scheme to defraud Allstate was dependent upon a succession of misrepresentations and omissions of material fact related to the Count XI Defendants' eligibility for and entitlement to reimbursement under Illinois law.

1019.  The Count XI Defendants' misrepresentations and omissions of material fact were conveyed through statements made in Count XI Defendants' records, documents, notes, reports, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment.

1020.  The Count XI Defendants' statements and representations were false, or they at least required the disclosure of additional facts to render the documents, information, and materials furnished not misleading.

1021. The Count XI Defendants knew that Allstate would rely on the Count XI Defendants' documents when deciding to pay claims, so they purposely and intentionally misrepresented or omitted material facts to induce Allstate into making payment on the claims.

1022.  When Allstate paid the Count XI Defendants directly, or when Allstate paid a third-party bodily injury claim that was supported by billing submitted by the Count XI Defendants, Allstate reasonably believed that it was legally obligated to make payments on these claims based on the representations made in the records and bills created and submitted by (or on behalf of) the Count XI Defendants.

1023.   Each and every payment that Allstate was caused to make to (or for the benefit of) the Count XI Defendants during the course of the scheme constitutes a benefit that the Count XI Defendants aggressively sought and voluntarily accepted.

1024.   The Count XI Defendants caused the Count XI Defendants to wrongfully obtain a multitude of payments from Allstate as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.  Allstate's injury is the direct and proximate result of the Defendants' unlawful conduct.

1025.   The Count XI Defendants obtained substantial monetary benefits as the result of their unlawful conduct during the course of this scheme—benefits that were derived, in part, directly from the monies that Allstate was wrongfully induced to pay on the insurance claims at issue in this Complaint.

1026.   Retention of those benefits by any of the Count XI Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT XII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
**(Against Advanced Care Rx LLC, JLV1, S.C. d/b/a Advance Spine & Rehab Center, Metro North Surgical S.C., Midwest Pain Specialists S.C., and Promedix, P.C.)**

1027.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-910 as if set forth fully herein.

1028.   In view of its billing for (1) unlicensed ambulatory surgery center fees; (2) unlicensed DME fees; (3) treatment not rendered; (4) unlawful referrals and prescriptions; (5) unnecessary healthcare services provided pursuant to a pre-determined treatment protocol; and (6) at grossly excessive charges, Advanced Care Rx LLC, JLV1, S.C. d/b/a Advance Spine & Rehab

Center, Metro North Surgical S.C., Midwest Pain Specialists S.C., and Promedix, P.C. (collectively, the "Count XII Defendants") were, at all times relevant, completely ineligible for reimbursement under Illinois law, and thus have no standing to submit or receive insurance benefits from Allstate, and thus have no standing to submit or receive insurance benefits from Allstate.

1029.   The Count XII Defendants continue to submit, or continue to cause to submit, claims to Allstate demanding payment, and other claims remain pending with Allstate.

1030.   The Count XII Defendants continue demanding payment for claims that remain pending with Allstate.

1031.   The Count XII Defendants continue to challenge Allstate's prior claim denials and seek payment in connection with first party and third party bodily injury claims.

1032.   A justifiable controversy exists between Allstate and the Count XII Defendants because they reject Allstate's ability to deny such claims.

1033.   Allstate has no adequate remedy at law.

1034.   The Count XII Defendants will continue to bill Allstate for absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future claims submitted by the Count XII Defendants.

1035.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring (a) that the Count XII Defendants have no standing to seek, collect, or retain any payments made by Allstate, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, the Count XII Defendants.

XI.     **DEMAND FOR RELIEF**

WHEREFORE, Allstate respectfully prays that judgment be entered in its favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ADVANCED CARE RX LLC ENTERPRISE**
**(Against Jamie Vandenelzen, D.C., Arash Raei, PharmD, and Faisal Sahawneh, PharmD)**

(i)      AWARD Allstate's actual and consequential damages to be established at trial;

(ii)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii)    GRANT injunctive relief enjoining the Count I Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)    GRANT all other relief this Court deems just and proper.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ADVANCED CARE RX LLC ENTERPRISE**
**(Against Jamie Vandenelzen, D.C., Arash Raei, PharmD, and Faisal Sahawneh, PharmD)**

(i)      AWARD Allstate's actual and consequential damages to be established at trial;

(ii)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii)    GRANT injunctive relief enjoining the Count II Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)    GRANT all other relief this Court deems just and proper.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**JLV1, S.C. d/b/a ADVANCE SPINE & REHAB CENTER ENTERPRISE**
**(Against Jamie Vandenelzen, D.C., Ansu Durgut, D.C., Alex Karban, D.C., and Advance**
**Specialists Holdings S.C.)**

(i)     AWARD Allstate's actual and consequential damages to be established at trial;

(ii)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii)   GRANT injunctive relief enjoining the Count III Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)   GRANT all other relief this Court deems just and proper.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**JLV1, S.C. d/b/a ADVANCE SPINE & REHAB CENTER ENTERPRISE**
**(Against Jamie Vandenelzen, D.C., Ansu Durgut, D.C., Alex Karban, D.C., and Advance**
**Specialists Holdings S.C.)**

(i)     AWARD Allstate's actual and consequential damages to be established at trial;

(ii)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii)   GRANT injunctive relief enjoining the Count IV Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)   GRANT all other relief this Court deems just and proper.

-157-

**COUNT V**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**METRO NORTH SURGICAL S.C. ENTERPRISE**
**(Against Jamie Vandenelzen, D.C.)**

(i) AWARD Allstate's actual and consequential damages to be established at trial;

(ii) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii) GRANT injunctive relief enjoining the Count V Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv) GRANT all other relief this Court deems just and proper.

**COUNT VI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**METRO NORTH SURGICAL S.C. ENTERPRISE**
**(Against Jamie Vandenelzen, D.C.)**

(i) AWARD Allstate's actual and consequential damages to be established at trial;

(ii) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii) GRANT injunctive relief enjoining the Count VI Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv) GRANT all other relief this Court deems just and proper.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**MIDWEST PAIN SPECIALISTS S.C. ENTERPRISE**
**(Against Jamie Vandenelzen, D.C.)**

(i) AWARD Allstate's actual and consequential damages to be established at trial;

(ii)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii)    GRANT injunctive relief enjoining the Count VII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)    GRANT all other relief this Court deems just and proper.

## COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### MIDWEST PAIN SPECIALISTS S.C. ENTERPRISE
### (Against Jamie Vandenelzen, D.C.)

(i)     AWARD Allstate's actual and consequential damages to be established at trial;

(ii)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii)    GRANT injunctive relief enjoining the Count VIII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)    GRANT all other relief this Court deems just and proper.

## COUNT IX
### VIOLATION OF 720 ILCS 5/17-10.5
### (Against all Defendants)

(i)     AWARD Allstate's actual damages in amount to be determined at trial, as is set out in Exhibits 10-14;

(ii)    AWARD Allstate the amount the defendants sought or attempted to collect from Allstate in cases where no payment was made pursuant to 720 ILCS 5/17-10.5(e)(1) (subject to mandatory doubling), as is set out in Exhibits 15-20;

(iii)    AWARD Allstate treble damages for actual damages and its attorneys' fees pursuant to 720 ILCS 5/17-10.5(e)(1); and

(iv)    GRANT all other relief this Court deems just and proper.

## COUNT X
### COMMON LAW FRAUD
### (Against all Defendants)

(i)    AWARD Allstate's actual damages in an amount to be determined at trial;

(ii)    AWARD Allstate its costs, including, but not limited to, investigative costs, incurred in the detection of the Defendants' illegal conduct; and

(iii)    GRANT any other relief this Court deems just and proper.

## COUNT XI
### ILLINOIS UNJUST ENRICHMENT
### (Against all Defendants)

(i)    AWARD Allstate's actual and consequential damages in an amount to be determined at trial; and

(ii)    GRANT any other relief this Court deems just and proper.

## COUNT XII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Advanced Care Rx LLC, JLV1, S.C. d/b/a Advance Spine & Rehab Center, Metro North Surgical S.C., Midwest Pain Specialists S.C., and Promedix, P.C.)

(i)    DECLARE that the Count XII Defendants billed for medication, DME, services and procedures that were provided in violation of Illinois law;

(ii)    DECLARE that the Count XII Defendants charge for medication, DME, services and procedures that are unlawful;

(iii)    DECLARE that Allstate has no obligation to pay any pending, previously denied, and/or future claims submitted by the Count XII Defendants for such medication, DME, services, and procedures; and

(iv)    GRANT all other relief this Court deems just and proper.

## **JURY DEMAND**

Allstate hereby demands a trial by jury on all issues claims so triable whether in this pleading or any amended pleading.

[SIGNATURE PAGE FOLLOWS]

KING, TILDEN, MCETTRICK & BRINK, P.C.

*/s/ Nathan A. Tilden*

_____
Nathan A. Tilden
ntilden@ktmpc.com
Douglas D. McInnis
dmcinnis@ktmpc.com
350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Indemnity Company,*
*Allstate Property & Casualty Insurance Company,*
*Allstate Fire & Casualty Insurance Company, and*
*Allstate North American Insurance Company*

Dated: January 17, 2025